### UNITED STATES v. AMERICAN CAN CO. et al.

#### (District Court, D. Maryland. February 23, 1916.)

MONOPOLIES ☞20—COMBINATIONS IN RESTRAINT OF TRADE—SUIT FOR DISSOLUTION.

Defendant American Can Company was organized in 1901 with capital stock, common and preferred, of $88,000,000, $78,000,000 of which was issued to the promoters in payment for 95 plants which made probably 90 per cent. of the cans then manufactured for sale in the United States and options on which had been secured by the promoters. They paid for the plants in cash or its equivalent in stock at one-half par value $23,-500,000. New plants with new machinery of equal capacity could have been built for not to exceed $10,000,000. For some of the plants they paid many times the value of the physical property. They also required the sellers if individuals, or if corporations their officers, to sign agreements not to again engage in the business for 15 years within 3,000 miles from Chicago. Defendant also acquired patents on can-making machinery and made contracts with the principal manufacturers of the best machinery intended to prevent others from buying it for a term of years. During the first year, defendant largely increased prices; but, the effect being to induce others to enter the business, it abandoned the policy. About two-thirds of the plants purchased were closed. By the end of 12 years, when the government brought suit for its dissolution, defendant was perhaps marketing no more cans than the aggregate of its competitors. For some years before the suit, defendant did not attempt to do away with competition, or to monopolize the business, but its methods and prices were fair and its standing good with customers and competitors. The most of the concerns absorbed by it and of others afterward acquired went out of existence. *Held*, that the organization and early methods of de-

fendant were intended and calculated to restrain competition in the manufacture and sale of cans, and to monopolize the same, and were clearly illegal as in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1 and 2, 26 Stat. 209 (Comp. St. 1913, §§ 8820, 8821); that while its large capital and business make it a potential instrument which may be used to restrain or monopolize a part of the commerce among the states, so long as no attempt is being made at present to so use them, and in view of the fact that former conditions cannot be restored, and that under its present methods by reason of its widespread business packers are enabled to make more beneficial contracts for the purchase of cans for future use, both from it and its competitors, than ever before, no public interest would be served by its dissolution, but that such interest would be better served by permitting the suit to stand open for such future action as changed conditions may require.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. ☞20.]

In Equity. Suit by the United States against the American Can Company, the Sanitary Can Company, the Missouri Can Company, the Martin Wagner Company, the Boston Wharf Company, the Max Ams Machine Company, the Freeman-Duncan Transfer & Realty Company, the Hawaiian Pineapple Company, Limited, the American Sheet & Tin Plate Company, Daniel G. Reid, Fred S. Wheeler, Henry W. Phelps, Franklin Rudolph, Rensselaer H. Ismon, W. F. Dutton, Roy A. Burger, Frank D. Throop, William T. Graham, Edmund C. Converse, Francis L. Hine, James McLean, George C. McMurtry, William Henry Moore, Joseph W. Ogden, Ray L. Skofield, J. Hobart Moore, William Y. Bogle, George W. Cobb, William A. Wagner, Edward A. Kerr, Frederick W. Wagner, Charles M. Ams, Emil Ams, Joseph B. Russell, William G. Duncan, and Michael Espert. On final hearing. Decree deferred.

George Carroll Todd, Asst. Atty. Gen., Henry E. Colton and William T. Chantland, Special Asst. Attys. Gen., and Samuel K. Dennis, U. S. Atty., of Baltimore, Md., for the United States.

John Barton Payne, of Chicago, Ill., George R. Willis, of Baltimore, Md., L. A. Welles, of New York City, and Frederick R. Williams, of Baltimore, Md., for defendants.

ROSE, District Judge. The United States, hereinafter called the "government," brings this proceeding under the fourth section of the Anti-Trust Act of July 2, 1890. It says that the American Can Company, a New Jersey corporation, was formed and has since been maintained in violation of the first and second sections of that statute. Originally, there were 9 other corporate and 27 individual defendants. By consent at the hearing the petition was dismissed as to 5 of the former and 8 of the latter. All of the defendants other than the American Can Company were brought into the case because the government thought they had taken part, either in its illegal organization, or in its subsequent unlawful acts. It will be referred to many times. The other defendants will be mentioned much less frequently. For brevity, it will be called the "defendant."

It has put 516 witnesses on the stand; the government 346. Between 1,500 and 1,600 exhibits have been filed. The record covers more than 8,700 printed pages. Nevertheless, an ordinary collision

case on the admiralty side of the court, or a moderately contested proceeding in bankruptcy, would raise more issues of fact. The government proved one set of circumstances. By cross-examination the defendant sought to minimize their effect, but it offered no evidence in contradiction. When its turn came, it proved other things. The government attempted to show from defendant's witnesses that, either they were not as well informed as they supposed themselves to be, or that there were many things in economics undreamt of in their philosophy; but, as a rule, it did not undertake to show that they were wrong as to any actual fact of real materiality or importance.

## What Has Been Proved.

What has been proved is: First, that the defendant was organized to monopolize interstate trade in cans, and to attain that object such trade was unlawfully restrained by it, and by those who formed it and directed its earlier activities, and that some of those individuals still participate in its management and control. Second, for some time before the filing of the petition in this case, it had done nothing of which any competitor or any consumer of cans complains, or anything which strikes a disinterested outsider as unfair or unethical.

## Legal Contentions of the Parties.

The government says that certain restraints once illegally imposed by the defendant upon the trade are still in force, in part at least. The defendant replies that, if in any sense so much is true, such restraints have long ago become theoretical rather than real, and, if the court thinks it worth while, the defendant has no objection to their being declared illegal, or even to an injunction forbidding their further enforcement.

The real controversy between the parties goes much deeper. The government says the defendant, by its size, its wealth, and its power, exerts a great influence upon the entire trade in cans, and that this influence, in some very important respects, notably as to the fixing of the price of packers' cans, is so great that it may, without straining words, be said to dominate the market.

The defendant answers its size is not a crime. The government replies, in substance:

"True, provided such size is the result of natural and legitimate growth, but not when it is the outcome of unlawful means used for the very purpose of securing a control of the market. In the latter case, so long as the control continues, the illegal purpose is still in process of execution, and, if nothing short of dissolving the defendant into a number of smaller companies will completely emancipate the trade, the court must decree such dissolution."

"The combination among the once independent concerns might have been otherwise effected. They might have subjected themselves to control of a single will, while each still preserved its individual existence. In that event, it would be clear that the court could and should put an end to the agreement among them."

Reference is made to those cases which hold that the way in which the combination is brought about is immaterial. If it seeks an end forbidden by the anti-trust acts, and that end is attained in whole or

in part, the government has a right to demand that it be dissolved. The defendant's answer may be thus summed up:

"With a very few exceptions, only one of which is of any real importance, all the units which have at any time come under its control are dead, beyond the hope of resurrection. The court cannot call back to life the many can-making concerns which died that the defendant might come into being, or which have since yielded up their lives to it. No order of court can make the dead breathe again."

"The number of once independent concerns absorbed by it can, it is true, be ascertained. If the court is bound to come as near as it can to putting things back as they were, it must dissolve the defendant into a like number of parts. Everybody feels that it is under no such obligation. The government does not ask that the defendant shall be divided into more than about half a dozen separate corporations. Why will it be content with a dissolution perhaps one-twentieth as drastic as would be required to restore the original status? Obviously, because it recognizes that a court of equity neither will, nor should, cause loss, destruction, or inconvenience, unless it has reasonable and probable grounds to believe that by so doing it will accomplish affirmative good. Its business is to prevent and remedy, not to punish. If it will not order a dissolution into 100 parts because nothing would be gained thereby, it will not decree a division into 6 or even into 2, unless it believes that good will follow. It must deal with facts as it finds them. If an illegal agreement is still in force, it must end it. If the agreement has long since been executed, and is itself at an end, the court may, if it can, put things back where there were before the agreement was made; but, if Humpty Dumpty cannot be set up again, the court must do the best it may with conditions as they are. The record shows that any dissolution will do more harm than good."

To this the government replies that:

"Even if for the sake of the argument the soundness of defendant's statement of legal principles should be admitted, it remains true that defendant acquired its controlling position in the trade as the result of an unlawful combination; that such control, even when legitimately acquired, if not illegal, is at the best a danger; and that, by the dissolution asked for, it can and should be ended."

## Why the Facts Are Reviewed.

It is upon the answers which the law requires to be given to these contentions that the judgment of this court must turn. Any statement of facts, in addition to that already made, other than those which bear upon the present relation of the defendant to the can trade, and upon the probable effect of its dissolution, or of its remaining undissolved, upon the public interests, is therefore, strictly speaking, unnecessary. The case may not stop here. It is not probable that either side will accept the conclusions above stated as being at once both accurate and complete. The court of first instance should give the appellate tribunal the benefit of its examination of the evidence, whenever the facts are disputed, or the inferences which should be drawn from them are contested.

Moreover, the history of the formation of the defendant, and of its subsequent conduct, of its effect upon its competitors, actual or potential, and upon the first and upon the ultimate consumers of cans, may be of far-reaching social and economic interest. All the 18 volumes of the record have been carefully studied to make sure what were the real issues in this case. It will be worth while to summarize the story they tell.

## Packers' Cans and General Line Cans.

The can-making trade has always made a distinction between cans for hermetically sealing food products, and cans for other purposes. They call the former packers', the latter general line, cans. Almost all packers' cans are now made of certain standard shapes and sizes, which are, or which are intended to be, the same, no matter from what shop they come. On the other hand, general line cans are of every variety, shape, and size, according to the use to which they are to be put, and the taste of him whose goods are to go in them.

There have therefore always been more customers for machinery for making packers' than for the manufacture of general line cans. The progress of invention in the former has, accordingly, been more rapid. Modern machinery for the fashioning of packers' cans doubtless costs far more than that in use 16 or 17 years ago, but even now it can be installed at an expense which is small as compared with the outlay necessary to equip such a plant as is required in many other industries. The small manufacturer has much greater difficulty in so fitting himself for the manufacture of general line cans, as to enable him to compete in all their kinds on approximately equal terms with a powerful rival. He cannot afford to buy all the types of machines which might be more or less advantageously employed in making some sorts of general line cans, because he will have very little use for some of them. He can wisely buy only such as are fitted for the making of the relatively few varieties of cans for which he can build up a considerable demand, or which can be used for some of the simpler operations required for the making of many kinds. Favored by local conditions, such as proximity to markets, etc., he may still make partially by hand, and sometimes may competitively sell, some sorts of general line cans.

## Can Making for Sale and Can Making for Use.

There have always been, as there are now, can makers who sell all the cans they make, can makers who use all they make, and still others who make a part or all of those they use and who habitually or occasionally sell some of those they make. It was formerly quite common for packers, and even for very small packers, to make the cans they used. Most of the work was done by hand. The machines they had were cheap and simple. Many packers, especially those whose canneries were in rural districts or in small towns or villages, felt it expedient, if not necessary, to find work throughout the year for some of the hands whose services they needed in the packing season. This practice was going out of fashion before the organization of defendant. To-day it is almost extinct among small packers. On the other hand, tin cans are now used for many purposes for which they were not then employed. There are concerns, each of which use great quantities of them, and of these a number prefer to make those which they need. Moreover, in some regions, peculiar conditions make it almost necessary that the user shall be also the maker. For illustration, salmon packing is one of the most important, if not the most important, of all Alaskan industries. The season's supplies needed for

the canneries on the banks of these far northern rivers, and for the men who work in them, must be sent up from the states. On the return voyage little is brought back except canned salmon. An empty can takes as much room in the vessel's hold as a full one, while the tin needed to make several thousand cans will occupy no more space than a case of a few dozen filled tins. Therefore those used in Alaska are made at the canneries there. A circumstance which illustrates how comparatively easy, from an economic standpoint, it still is to make cans in small factories remote from industrial centers.

### Can Making Before Defendant's Day.

In the fall of 1899, or the winter of 1899–1900, there were somewhere from 100 to 175 can makers who sold some or all of the cans they made. Their establishments varied in size and importance from little shops turning out a few hundred dollars worth of cans a year, to well-equipped factories whose sales in the like time ran up to hundreds of thousands of dollars. For the most part, each of them had one plant. There were a few exceptions. The Pacific Sheet Metal Works had factories at Los Angeles, San Francisco, Astoria, and Fair Haven. Norton Bros.' factory was at Maywood, Ill. Corporations controlled by it had plants at Baltimore and on Long Island. There was a Hunt plant at Cleveland, and another at Kansas City. The relations between Black and Krebs at Baltimore and the Dugdale Can Company at Indianapolis were close, as were those of the R. Tyne Smith Can Company of Baltimore and the Tri-State Can Company of Keokuk. Doubtless there were other such instances, but there could not have been many. From time to time there were price agreements between a few of the larger makers in particular sections of the country; for example, in Baltimore among the so-called Big Four, and in the Chicago-Indianapolis district. These were, of course, terminable by any of the parties at any time. In the light of our present knowledge, they were doubtless illegal, as they were certainly nonenforceable. There was always the probability that one of the parties to such a gentlemen's agreement might suspect that some one of the others was not acting as a gentleman should, and then, as apparently happened in 1898, open competitive warfare took the place of the more or less uneasy truce which had for a while prevailed. In short, although in certain districts barriers against competition were from time to time erected, some of which proved for a while more or less effective, actual competition in large parts of the country was always operative, and in all sections and at all times there were the potential possibilities of a competition which in a few hours might become real and intense. So far as the record discloses, there never was any restraint upon the perfect freedom of competition in the sale of general line cans.

It is not easy to say what the condition of the can-making industry, as viewed from the standpoint of those engaged in it then, was. The difficulty arises from the fact that most of the witnesses who have testified each tell two mutually contradictory stories. In one breath, they describe the actual conditions of the business under the strain

of the competition, subject to which it was then carried on, as very bad. They paint its future prospects as gloomy in the extreme. In the next breath, when asked to explain the reasonableness of the prices at which they sold out to defendant and which might be anywhere from 2 to 25 times the tangible value of all they had in the business, they wax eloquent over the large profits they were making and the hopeful outlook that the future had for them.

The facts probably were that many, if not most, of the can factories, in common with almost all other lines of business, had felt acutely the hard times from 1893 to 1898, augmented as they were by the sharp price war in packers' cans in the last-named year. About that time tin plate fell to what apparently was the lowest point it ever reached. As a result, packers' cans then sold for less than they have ever brought at any other time, before or since. Many of the can makers had shared in the improvement in general business conditions which set in shortly after midsummer of 1898, and in the period which followed some of them doubtless did very well indeed. The men in that business, like all others, had their ups and downs, their trials and their worries, among which not the least was the energetic efforts of their competitors to get their customers away from them.

Comparatively few of them were well equipped with the best machinery then obtainable. Not many of the plants were housed in buildings erected for them. Most of them occupied structures which had been originally put up for other purposes. Relatively little high skilled labor was then, or apparently now is, required in can making. Under such conditions, provisions for the employés' comfort and health were not likely to be what they should have been.

## General Conditions in 1899–1901.

The period of depression which followed the panic of 1893 was by one cause or another prolonged until the close of the Spanish-American War, five years later. When the tide turned, it did so with a rush. In a few weeks the industrial and financial world passed from the nadir of pessimistic gloom to the zenith of optimistic glamour. Some men made fortunes almost over night, and countless others hoped to. Some of the earlier combinations, or so-called "trusts," whose formation and activities had led to the passage of the act under which this proceeding was instituted, had been very successful. It was quite as true that a number of others had in the panic, or in the subsequent era of depression, gone down to destruction. The misfortunes of those who failed were forgotten, or, when recalled, were laid to individual mismanagement. Most people believed that, if a monopoly could be secured in any line of business, the profits which would be earned would be almost unlimited. Some shrewd men knew that, in that state of public opinion, the money, which would be made by those who promoted the combination of most of the leading competitors in any line of industry, might be magnificent. Perhaps even they, to a greater or less extent, shared in the general opinion that 2 and 2 so put together would make, not 4, but 22. But whether it was sound or not made little difference to them. They did not expect to get their re-

230 F.—55

ward from the successful operation of the combination. With good management they might realize their profits before it had really started in business.

It was almost universally supposed that there were no legal obstacles in the way of combining any number of individual plants, no matter how large a proportion they might constitute of all theretofore engaged in any one line of business. Men thought that United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, had been decided upon the facts as the world knew them to be, and not as the subsequent decisions of the Supreme Court showed, merely upon that small portion of such facts which the record in that case happened to disclose.

From 1898 to 1902, or thereabouts, the work of forming new combinations went rapidly on. In some industries, as in the manufacture of steel, there was special and real need for bringing under one control the whole series of operations which began with the mining of the ore and ended with the delivery of the finished product to the ultimate consumer. In still others, there were peculiar conditions which seemed to make some consolidation expedient. In many there was something or other which might have been bettered. In all, some of the things which one would rather have had otherwise were brought about by the pressure of the competitive struggle. The panacea popular in financial and business circles, if not among the consumers, was the elimination of competition.

One of the difficulties in finding out how far any particular combination was really the result of internal economic and industrial forces is that those forces never worked alone. The activity of promoters who might be men already in the trade, but who sometimes never had been, usually bore a large part in bringing about a consolidation. Often it had more to do with the result than all other causes combined, and in some cases it is difficult to resist the conclusion that it was about the only reason why amalgamation was ever attempted. It is quite possible that in an industry like can making, as it was carried on in the closing years of the last century by more than 100 separate concerns, no union, however desirable from the standpoint of either the can makers or the public, could have been brought about except by the efforts of some individuals who thought they could make a quick and large profit for themselves by uniting the various plants under one management, no matter what the immediate or even the ultimate results of such union might prove to be. If that be so, those who think the result desirable will hold that promoters' profits and the extravagant sums required to induce so many independent manufacturers to sell out were a part of the inevitable price of achieving a useful purpose. Unfortunately, under such circumstances the cost of getting rid of competition sometimes proves almost as great as that of letting it alone.

### Defendant's Genesis.

To pass from the general to the particular: The men who really brought about the organization of the defendant do not appear to have

been more than five in number, and only one of them, Edwin Norton, was a can maker. He did practically all the work of persuading, inducing, or coercing the can makers to sell out. He and his brothers had been for a number of years the largest and doubtless the most generally known manufacturers of cans in the country, as he was certainly one of the most active and aggressive. The factories of his firm had probably the best equipment of labor saving machinery. Certainly in this respect they were surpassed by none. He had. been a party to the price maintaining agreements and a prominent figure in the price war already alluded to. The idea of forming a can combine seems to have occurred to him more than once, although the record appears to indicate that the scheme which was actually carried through originated, not with him, but with the defendant William H. Moore and his partner and brother, the defendant J. Hobart Moore. With them from the beginning, or at all events from a time preceding the actual formation of the company, were associated the defendant Daniel G. Reid and one William B. Leeds, now dead. Counsel have said that Norton is also dead, although that fact does not appear to be stated in the record. The other three of the original five, namely, the two Moores and Reid, although defendants, all of them directors, and two at least of them active in the management of the defendant, have not testified.

The record shows that in the latter part of 1899 Norton was commissioned by the Moores to get options on can-making plants, and then, or later, on plants for making can-making machinery, as well. He set about this mission promptly, and apparently had little difficulty in getting many of the desired options. These, by their terms, were to expire, if not exercised, on May 1, 1900. According to his contemporaneous written statement, the work of obtaining those desired had been practically completed before the 25th of April, 1900. Before that date came around, there had been a slump in the stock market, and for a short while financiers laid aside their rose-colored glasses. Though the first options had named Norton as the prospective buyer, the fact that Judge (William Henry) Moore was the leading spirit in the new venture was stated by Norton and was generally known. In April of 1900, Norton wrote to those from whom he had obtained options, telling them, among other things, that the slump in the stock market had made it unwise to go ahead, and requesting an extension of the option to January 1, 1901, so as to give Judge Moore ample time to put the thing through properly, when conditions were right.

For the purpose of discussing the situation, various meetings of the can makers who had given options, or who it was hoped would give options, were called by Norton, and some of these meetings he attended in person. Among other things, it appears to have been suggested at them that it would be expedient, in view of the prospective consolidation, to maintain prices. The testimony seems to indicate that the price of cans during 1900 was considerably higher than it had been in the immediately preceding years. Subsequently further extensions of the options to April 1, 1901, were asked and secured. They were,

as to most of the plants, exercised about the 20th of March of that year, and, as to nearly all of the rest, within 60 days thereafter.

## What Proportion of the Can-Making Plants Sold Out.

The parties are not in agreement as to the precise number of plants taken over by the defendant. Controversy is over classification, rather than as to the ultimate facts. The president of the defendant on April 21, 1903, in his report to its stockholders, said that when it was formed, and since, it had taken over 123 plants. Almost all of these were acquired at or within 60 days after defendant's organization. A few of them were establishments not engaged in the making of cans, but in the manufacture of can-making machinery. It is not worth while to try to estimate accurately the number of can-making plants acquired by the defendant at or about the time of its formation. To put them somewhere over 100 will be near enough the truth. The industry of one of the counsel for the defendant has picked out of the record and marshaled in its brief the names of 77 concerns which were in business at the time defendant was formed, and were not acquired by it. A comparison of this list with the record shows that a number of them were engaged in canning or in other lines of industry and sold a part of the cans they made. In many cases, the purchase of the can-making plants apart from the business with which they were connected would have been impossible. Still others were small hand shops, sometimes making other things besides cans. As to many of them, the record gives little or no information except that individuals, firms, or corporations by their names are believed by witnesses to have been in business in 1901. A very few of them are still making cans. If in 1901 their output had been as large as it now is, some of these surviving would have been considered important.

It is significant that nearly all which now exist began business in 1900 or 1901, after everybody knew that a scheme to combine the existing plants was on foot. Whether the then prospective absorption of the existing factories led to a belief that there would be room for other concerns, or to the hope that a new shop would also be bought, as a number were, it boots not now to inquire. The evidence is convincing that everybody then in a position to know believed that the purpose of defendant's promoters was to absorb practically all the can-making plants of any importance. At the time it was generally supposed that they had succeeded in so doing. The defendant was sometimes referred to as the hundred per cent. trust. One of the members of the firm of Norton Bros., a brother of Edwin, testified that he himself never thought it had 100 per cent. of the country's can-making plants, but he did believe it had from 95 to 98 per cent. of the total capacity, excluding those concerns which made cans for their own use. It is very possible that even this estimate is somewhat too high. Nevertheless, many exceptionally well-informed witnesses found great difficulty in recalling, in their section of the country, the name of a single can plant which was not taken over by defendant. No such approach to precise accuracy as is possible in the great steel industry which can be carried on only in plants of considerable magnitude is possible

here, but there is every reason to believe that the defendant acquired the business and plants of concerns which on the 1st of January, 1900, made 90 per cent. of the cans used in this country and not made by establishments which themselves used the whole or a part of their output.

## Why Did So Many Can Makers Sell Out?

How were so large a proportion of the can makers induced to sell? Fear of what would happen to them, if they did not, unquestionably had more or less influence with a good many of them. There is some testimony that Norton told some of them that if they did not sell out they would be put out.

The record does not affirmatively show that such threats were frequently made. They were not required. Apart from anything he said, apprehension was quite general that the only choice was between going out or being driven out. The country was at that time familiar with stories of the fate of those who in other lines of business had refused liberal offers from combinations previously formed. The records of the so-called Anti-Trust cases have since shown that some of these tales were not without foundation in fact. What was most feared was that a can maker who did not go into the combine would have difficulty in getting tin plate, the raw material of his business. The concern to which the defendant the American Steel & Tin Plate Company succeeded, and which, together with that successor, will be called the "Tin Plate Company," had been then recently organized. Prominent among those who officiated at its birth were the Moore Bros., Reid, and Leeds. Norton and others spoke as if the relations between the proposed can company and the new Tin Plate Company would be very close. Throughout the can trade it was currently believed that they would be. In point of fact, it is probable that they did not become as close as Norton then wished everybody to think, or as close as he then, himself, expected. There is testimony that he afterwards said that for this purpose the defendant had been born a year too late. An intimate connection between the Tin Plate Company and the defendant was a danger to all other can makers. If it should suit the defendant to wage a price war, its competitors would be hopelessly handicapped, if it were able to buy its raw material appreciably cheaper than they. Nor were price discriminations all that they feared. Failure to make deliveries when and as required might be even more destructive to their business. Before the defendant was formed, it became known that it had acquired many options on patents for can-making machinery, and apprehension that it would be difficult for outsiders to secure an up-to-date line of machinery was rife, and, as the sequel shows, was amply justified.

Moreover, at that time few people knew anything of the ability of a small producer to maintain himself in competition with a rival having resources exceeding his 10, 20, or 100 fold. Possibly, the last word on that subject has not yet been spoken, but the experience of the last 15 years has apparently shown that in many lines of business the small

man can, under such conditions, live and even thrive. Then, many feared that it was not possible.

It is to be borne in mind that, for reasons already stated, few of the can makers were, or could have supposed themselves to have been, even moderately equipped to carry on a competitive struggle with a rival possessed of many times their capital. Some of them who were financially stronger than most of the others were elderly men, or were in poor health, or for other reasons were loath to venture upon so perilous a warfare.

It is not suggested that there was any general, intense, and settled objection to selling out to the defendant, or its promoters. If there had been, doubtless so many would have postponed giving options that the idea that everybody was going in could not have so rapidly spread. If it had not, a good many of those who did sell out might never have done so. All that is meant is that, except for the fears already stated, a number who gave options would not have done so, and some of those who really were willing enough to give them would have taken a chance on standing out for even a larger price than they received.

## Prices Paid for Plants.

As a rule, the prices paid were liberal, not only to the verge of extravagance, but in cases almost beyond the limits of prodigality. If Norton sometimes showed the can makers that there was steel in his scabbard, his hands always dropped gold. The record does not disclose a single case in which the price named in the option did not exceed the value of all the tangible property transferred. The amounts paid appear to have ranged all the way from $1\frac{1}{2}$ to 25 times the sum which would have sufficed to have replaced the property sold with brand new articles of the same kind. Before agreeing on the figures to be inserted in an option, Norton does not appear to have taken the trouble either to make, or to cause to be made, any inspection or appraisement of the plant to be transferred. Under such circumstances, the ratio between the real value and the price named depended more upon the nerve or the impudence of the seller, than upon any estimate of his property's probable worth to the new combination.

The defendant has no record of what was paid for the different plants so acquired. Wherever the seller was still alive, could be located, and was in physical and mental condition to testify, the government has proved by him what he received for his property, and so far as he could, or would, tell what it had cost him. In some cases the former information, in many the latter, could not be obtained.

From a careful study of what the record discloses, I have reached the conclusion that the amount which the promoters agreed to pay for the plants taken over through them was probably somewhere around $25,000,000, of which not more than $23,500,000 was given for the 95 plants turned over to the defendant on the day after it was organized. It is certain that for half, and not improbable that for a third or less, of that money, defendant could have purchased land, erected buildings, and equipped them with machinery which

would have had a greater capacity, could have been operated at a smaller cost, and would have been at least as well, if not better, located with reference to the needs of the consumer and the facilities for transportation.

It is true that not all of the sellers received their whole price in cash. A month or more before the formation of defendant, Moore Bros., calling themselves managers, circulated a subscription agreement. This paper set forth that it was proposed to organize the defendant; that its stock was to be one-half common and one-half preferred, the latter entitled to a cumulative dividend of 7 per cent. per annum; that by the issue of $39,000,000 of preferred stock and the like amount of common, the defendant was to get $7,000,000 cash for general corporate purposes, and the real property, plants, buildings, fixtures, machinery, tools, patents, trade-marks, and good wills of 95 named concerns. For every $100 of purchase money, a subscriber was to receive a share of preferred and a share of common stock, each of the par value of $100. Some of the sellers of plants took all of the consideration in stock on that basis. Most of them took some of it. Within limits, efforts were made to induce them so to do. They were assured, and doubtless with entire truth, that the new company could not be formed at all unless the larger part of its stock was subscribed for by those whose plants it was to absorb. Yet no one of the sellers was actually forced to take stock. Some of those who received among the highest prices, both absolutely and relatively, did not take a share, as, for example, one concern which was paid $500,000 for a plant which had cost it from $60,000 to $70,000. From one incident, to be hereafter referred to in another connection, it must be inferred that the stock as late as the 10th of the succeeding October could still be sold at the subscription price, although the same incident strongly suggests that, if at that time any large quantity had been offered for sale, a bad break in the market would have followed.

#### . Restrictive Covenants.

With very few exceptions, all the options contained a clause which bound the sellers, in the event that it was accepted, not to engage for 15 years in can making within 3,000 miles of Chicago. Where the seller was a corporation, its principal officers personally bound themselves by like covenants. In some few instances, can makers declined so to restrict their freedom, and still their plants were bought. Nevertheless, the promoters obviously attached considerable importance to securing such covenants. It is in evidence that the owners of one plant struck it out from the first option they signed. Afterwards, they were induced to give another with it in, but in return were allowed to raise their price from $300,000 to $700,000.

#### Purchase of Stocks of Merchandise, etc.

As weeks and months might elapse between the giving of an option and its acceptance, some provision had to be made by which in the interval the prospective sellers could carry on business with fairness to themselves and to the would-be buyer. The price named in the option was intended to cover only what may be summarized as the

plant, patents, and good will of the business, including its real estate or leasehold interests. It was agreed that at the time the sale was consummated all fuel, raw material, and partially or wholly finished products should be bought at the then market price. The purchaser bound itself to assume all leases and bona fide contracts for the purchase or sale of material, raw or manufactured.

### Organization of Defendant.

All the preparations deemed necessary having been made, the defendant was on the 19th of March, 1901, incorporated under the laws of New Jersey. As was then, if not now, the fashion, the incorporators and first directors were all employés of a New Jersey Trust Company or of law firms concerned in the organization. The capital of defendant was fixed at $88,000,000, one-half common, one-half preferred.

On the day after the incorporation, these directors received from one McCaughy, to whom all the later options had been given or assigned, a proposition to sell to the defendant the 95 plants which had been named in the subscription agreement, and to pay it $6,995,000 in cash. The $5,000 more needed to make up the $7,000,000, promised in the agreement in question, had already come into the defendant's treasury in the form of payments for the qualifying shares of preferred stock issued to the first directors. His price was $38,995,000 in par value of preferred and $39,000,000 in par value of common stock. The company was, of course, to assume all his obligations to buy the merchandise of the plants taken over. Then the minutes carefully state that "statements and estimates by Mr. Edwin Norton, familiar with said°properties and the business thereof, were made to the board relative to the value and earning capacities of the properties and business aforesaid," and the directors thereupon resolved that their acquisition was necessary. McCaughy's proposition was accepted. He was a clerk in Moore Bros.' employ.

It will be borne in mind that not one of the five directors who, on behalf of the defendant, bought, nor McCaughy, who sold, had a dollar's worth of interest in the transaction, or, so far as it appears, ever expected to have. It is to be regretted that in organizing large corporations there ever was a real or supposed reason for all this elaborate make-believe, for the putting of dummies in the foreground while the real principals kept themselves in the rear. It is true it was the fashion. Everybody who took any part in the transactions, or who at the time had any real interest in them, knew, or upon the slightest inquiry could have found out, that none of the men who figured on the corporate minutes as buyers or sellers were in fact such; that the directors, in spite of going through the form of listening to Norton's estimates, etc., had never exercised any judgment of their own, and had never been expected to. Nevertheless, if there is no purpose in going through such play acting, it had better be omitted. If it accomplishes anything, it must be in the way of making it easier for those who really will what is done to escape responsibility for it, if they should ever want to. Whenever in the course of an investigation of the corporate history the facts come out, they tend to make

very many people who are neither lawyers nor wise in the ways of large corporations feel that juggling and deception are a part of corporate life. Danger to the community lies that way. So much by the side.

### The Promoters' Share.

As has already been stated, the prices named in the options for the 95 plants, extravagant as in most cases they were, could not apparently have exceeded $23,500,000. The promoters were to furnish $7,000,000 cash, or, in all, in stock and money they were to lay out $30,500,000, for which they received $39,000,000 preferred and $39,000,000 of common stock. At the price of $100 for a share of common and share of preferred, their return was to be the difference between $39,000,-000 and $30,500,000 or $8,500,000, a sum which, in cash, wisely expended, would itself have sufficed to have given the defendant far better can-making facilities than it secured.

Defendant and its counsel insist that it and what it has done have been of great benefit to all connected with the can-making industry. It is fair to presume that its promoters must have thought so to, otherwise they would scarcely have been justified in rewarding themselves upon so liberal a scale for having brought it into being. They, of course, assumed some heavy responsibilities. How serious these were it is not possible now to estimate. Much of the stock had been taken by the sellers of individual plants; much of it had not been. Doubtless a good deal of it was absorbed by the public. In the end, the defendant itself relieved the promoters from the burden of some of it. Something more than six months after the defendant was organized, or, to be precise, on the 10th of October, 1901, there was a meeting of its executive committee. On behalf of McCaughy, it was stated that in securing the plants he had found it necessary to obtain advances on the stock of the defendant and that he was forced to sell some of it; that he had received an offer of $1,052,300 for such stock at the original price of $100 for a share of common and a share of preferred, but, before he sold elsewhere, he wished to make the same offer to the defendant. It will be rememberd that McCaughy had no interest in the transaction and did not own any of its stock, and was a mere employé of the Moores. Of the six members of the executive committee present when his proposition to be relieved of the stock was accepted, four were among the five original promoters, namely, W. H. Moore, Reid, Leeds, and Norton. The record does not disclose how the defendant ultimately came out on this transaction. It is certain that shortly after that time its stock declined below the figure named, and for a number of years remained below.

The chief purpose, however, for referrring to this incident, is because of the light it throws on another phase of the defendant's history. It will be remembered that it was supposed to start its business life with a cash working capital of $7,000,000. This purchase of its own stock reduced that sum, at least temporarily, to $5,947,700. It had agreed to purchase, and in fact had purchased, the stocks of merchandise, etc., of the plants taken over at and within the first three

months of its organization. One of its books in evidence seems to show that the money expended for this purpose was about $6,250,000. In other words, it really began life without a free dollar to its name, an experience which was by no means unusual in the flotations of that period.

### Control of Can-Making Machinery.

Much can-making machinery, more or less in use as late as 1900 had never been patented, or, if it had been, the patents on it had expired. A great many of these machines were of such simple construction that they could be made in almost any fairly equipped machine shop. To secure control of all such would have been impossible. Some of the most modern machines, those by which a large part of the work formerly done by hand was performed automatically, were, however, covered by patents. If these patents could be secured and arrangements made with the few machine shops in the country which were then equipped for turning out machinery of that class, competition in can making and can selling would be greatly hampered. Indeed, if the possibility of competitors obtaining such machinery could be cut off for a comparatively limited period, possibly even for a year or two, the can company which acquired a number of plants equipped with such machinery, and which could obtain more of it from the manufacturers, could, if its operations otherwise were wisely carried on, secure a domination of the market, which could not be seriously shaken for years to come. The record shows that the defendant did acquire such control, although, for reasons to be subsequently pointed out, it did not reap all of the results which it naturally expected therefrom. It sought for six years to close to its competitors the machine shops which really counted. The largest manufacturer of automatic machinery for can-making purposes was the E. W. Bliss Company. For the sum of $25,000 a quarter, that company agreed that for six years it would not make certain can-making machinery for anybody other than the defendant. The latter had made some claim that patents owned by it covered such machines. The Bliss Company did not think they did. In any event, it is unusual for the owner of patents to pay somebody else $100,000 a year not to infringe. From the Adriance Machine Company defendant agreed it would annually for six years take $75,000 worth of machinery. That amount represented the full capacity of the machine company. To the Ferracute Machine Company, in return for exclusive privileges, the defendant guaranteed a profit of $10,000 a year for six years. Defendant induced the Bliss Company to break contracts which the latter had already made to furnish such machinery, and, when the injured parties sued the Bliss Company for damages thus resulting, the defendant paid both the expense of defending the suits and the substantial judgments some of the aggrieved parties recovered.

An interminable mass of evidence has been taken to show what machines for can making were in use at different periods, which of them at particular times were covered by patents, and which were not, and the various shops in the country at which such machines could

be made. It is impossible to review this testimony in detail. The record amply justifies the assertion that for a year or two after defendant's formation it was practically impossible for any competitor to obtain the most modern, up-to-date, automatic machinery, and that the difficulties in the way of getting such machinery were not altogether removed until the expiration of the six years for which the defendant had bound up the leading manufacturers of such machinery. The contracts between the defendant and some of these machine shops were sometimes evaded. The machine makers had reserved the right to sell machinery for export to countries other than the United States and Canada. Some of that machinery was exported and brought back to the United States. Some of it never got further than the dock in New York or Jersey City, and thence found its way to a can-making factory somewhere in the United States. The demand for can-making machinery which sprang up at the time the defendant was organized, and largely in consequence of the policy which it then pursued, stimulated the supply, and other inventors and other machine shops, before very long, began to turn out some very good can-making machinery.

### Tin Plate at Preferential Prices.

The record does not disclose whether the promoters of the defendant really had reason to believe that they would be able practically to shut off the supply of tin plate from their competitors, as Norton in 1900 and early in 1901 was at least willing that the trade should think. As already stated, none of the promoters have seen fit to tell their story under oath. As it turned out, all the Tin Plate Company was willing to do was to bind itself to sell its tin plate to defendant at a certain fixed figure, below the price at which it sold to any one else. This preferential discount or rebate amounted, when the published list price of tin plate was $3.50 a base box, to about 64 cents on the quantity of plate required to make 1,000 3-pound packers' cans. This difference, the record shows, was far from negligible. In a close competitive struggle it might well have proved a decisive factor.

### Dismantling Plants.

The defendant began to shut up plants so soon as it got possession of them. It kept on shutting them up until by April 21, 1903, it was operating only 36 can factories, and 3 machine shops, and it then proposed to close 5 more of the former and 1 or 2 of the latter. There has been a good deal of profitless dispute as to the proper term to describe what was done. What the government terms "dismantling" the defendant prefers to speak of as "transferring" or "concentrating." What actually took place is clear enough, whatever one may choose to call it. Two-thirds of the plants bought were abandoned within two years of their purchase. Many of them were never operated by the defendant at all, and others were closed after a few weeks or a few months. Where they had any machinery for which use could be found at some other of defendant's plants, such machinery was transferred to the place where it could be used, which might be a few blocks away in the same city or hundreds of miles off in another

state. Where it was possible that a piece of machinery might some day be of some use, although there was no immediate call for it, it was sent to some abandoned factory building to be there stored until it was wanted, or until it became clear that it never would be. Such machines, and there appear to have been many of them, as were too obsolete for economical use, were broken up and their fragments sold as junk. Defendant has offered much testimony which shows that what it did, did not reduce the aggregate productive capacity of its plants below that of those purchased by it. Nevertheless, it is quite probable that, during the process of closing old factories with a view of concentrating production, there may have been a period in which the defendant was not able to turn out as many cans as it could have made had it simply continued to operate all the shops it had purchased to their full capacity. If so, the time during which this was true probably did not exceed a few months, or a year or two at the most; but, in any event, the reduction in productive capacity was a mere temporary incident, even if it be regarded as an inevitable one of the policy of concentration, and was not in itself the end sought or desired. Defendant shut down most of the plants it bought because that was by long odds the best thing to do with them. Cans could be made cheaper elsewhere.

### Purpose for Which Defendant Was Formed.

Defendant denies that in its formation or early conduct there was any purpose to restrain competition, or to secure a monopoly. It alleges that its organizers always had in mind the obtaining of some of the beneficent results which the record shows have in fact been realized. Its promoters have not seen fit, under the sanction and test of cross-examination, to tell us so themselves. Apart, however, from any presumption which may be drawn from their failure to take the witness stand, the facts dispose of this contention. The contemporaneous declarations of Norton show the purpose was to get into the combine all the important can makers and, so far as was practicable, the important makers of can-making machinery, as well. The carrying through of the plan was always understood to be dependent upon the securing of the greater number of the plants then engaged in business, a matter really of no importance, if the purpose in view had been nothing more than to engage in can making on a large scale and with up-to-date facilities.

No can factory at that time needed any other plant purchased to make it a complete economic unit. In this respect, conditions differed from those which at that time existed in the steel industry.

The business of lithographing on tin for the purpose of turning out decorated cans was then coming into vogue. There were can factories which had a decorating department. Most of them did not have. There were a few shops which decorated, but did not make, cans. It does not appear that the work of turning out completed cans was in any other respect divided between or among two or more factories. All the shops, however small, did all the work of converting tin plate into the finished can. If there had been any urgent reason for uniting

more closely tin lithographing and can making, there was no difficulty in doing so. Neither required any very large initial investment in machinery or tools.

There was no other conceivable reason, than the desire to suppress competition, for buying plants which it obviously would not pay to run, and at prices which in most cases far exceeded the cost of fitting up, with brand new and up-to-date machinery, factories capable of turning out several if not many times as many cans in the same time. It is in this connection that the prompt and wholesale dismantling is significant. What was done in that respect shows that the plants were bought, not for use, but to get them out of the market. If it be urged that they had an established business, and good will which it was worth defendant's while to pay for, the answer is twofold: First, that according to other claims of defendant, the methods followed by those concerns in their dealings with their customers were such that their good will was valueless, or certainly would become so when they were brought into competition with the manner of doing business defendant now says it was even then its purpose to adopt; and, second, that defendant paid quite as extravagant prices for plants which had neither good will nor established trade, for the simple reason they had not yet begun business at all. As, for example, one factory which had not made a can, and which had cost $16,000, was bought for $80,000, and another in this city, the machinery of which then recently purchased had cost $12,200, was sold to the defendant for $40,000. Very similar was the case of a man whose father had given an option on his established plant. The son thereupon put $10,000 in machinery and sold it to defendant for $20,000 of its stock and $40,000 in cash. He apparently thinks he did not get quite as much as he should.

There can be no possible explanation of such transactions, except that the defendant and its promoters wanted to extinguish competition and did not stop to inquire how much it would cost to do so. There could not have been any reason for paying a bonus of $100,000 a year to the Bliss Company, and less amounts to Adriance and Ferracute, except to make the re-establishment of competition more difficult. Securing, where possible, the covenants which bound the sellers not to engage in like business for 15 years within 3,000 miles of Chicago, had the same end. One who sells his business with its good will may, in order that what he offers may command its maximum value, lawfully bargain that he will not impair its worth by engaging again in that business anywhere in the region in which he had formerly carried it on. Such a limited restraint is lawful because it is reasonable and does not go beyond the occasion for it, but there is no legitimate reason why one who has carried on a business in one city and in the region within 100 or 200 miles of it should be asked to bind himself not to engage in the same kind of business in some place thousands of miles away. Some cases have held that, under peculiar conditions, a nation-wide restraint may be lawful. Assuming without deciding that that is true, it can only be when the business sold had itself extended from ocean to ocean. Not a single concern, which at or about the time of defendant's organization was bought by it,

had ever sold cans in any portion of the greater part of the territory in which it and its officers were required for 15 years to abstain from going into business. Many of them, probably, had never shipped a can more than a couple hundred of miles from their factories. The record shows that even now freight rates, the imperative necessity on the part of the purchaser that he shall be sure of reasonably prompt deliveries, and other causes, impose very marked geographic limitations upon the area in which a single factory can sell its output in substantial quantities. Defendant now seems to argue that no significance should be given to these restrictive covenants. The reason by which this argument is sought to be sustained is rather out of the ordinary. It is said that no attention should be paid to these covenants because they were clearly illegal, and every one knew they were. One reply is that people who were acting under the advice of about as able lawyers as were to be found anywhere do not deliberately and repeatedly do clearly illegal things without having a purpose in so doing, and especially do they not pay $400,000 to a single firm in order to have that illegal thing done by its members.

It is true that defendant has taken no legal proceedings to enforce these agreements, although the industry of one of its counsel has brought together in its brief 34 cases in which, according to him, the record shows that persons who have entered into the covenant broke it. Nevertheless, it was by no means always the idle thing the defendant now says it was. Defendant's representatives did not always speak in that tone. They more than once reminded persons who had signed it of its existence. It meant something even to defendant's counsel when they were cross-examining witnesses in this case. They frequently and quite naturally showed that they thought rather ill of one who had made such an agreement and had not kept it. In point of fact, some of its signers, perhaps many of them, believed it to be binding. Still others, and they were unquestionably numerous, having signed it, and taken money or money's worth for signing it, felt in honor bound to keep it. Such men cared nothing for what a court might say as to its legal enforceability. Their consciences enforced it as against themselves. The only possible reason for exacting its signature must have been to make probable that nowhere in the country would their skill be available for can making.

### Prices Raised.

With practically all the can plants in the country in its hands, with the control of the really effective can-making machinery secure for some time to come, it seemed that it would be a long while before there could be any chance for competition worth bothering about. Many people thought so. As already stated, many of the most experienced men in the business had been largely influenced in their selling out by the fear that successful competition with defendant could not be carried on. This forecast did not take sufficiently into account the extent to which, from the start, the defendant found itself handicapped, by the way in which it had been formed. The absurd prices paid for can plants, which it did not want, and could not

use, and the immense sum absorbed by its promoters, had resulted in a tremendous overcapitalization. As already pointed out, it started with scarcely any free working capital. It could not wait for its profits. They must be made at once and in large volume, otherwise it would be upon the rocks before it was well started on its voyage. Prices had to be raised. This raising had the added advantage of furthering the general acceptance of the idea that the defendant was going to be a tremendous money maker. In that way the process of absorption of the large mass of its undigested securities with which the promoters were doubtless still struggling would be greatly aided. Prices were put up. There is much dispute as to how great the rise was. That, of course, depends largely on what basis is taken for the comparison. As compared with the prices prevailing three years before, it was very great. It was appreciable, but not so striking, when contrasted with those quoted after the formation of the defendant had become probable or certain. Comparisons of one year with another during that period are difficult because of the violent fluctuations which then took place in the price of tin plate. Tin plate from 1896 to 1898 was low, being lower in the last-named year than any year before or since, while from 1899 to 1902 it was higher than at any other year from the time when the making of it had become actually established in this country, down to the filing of the petition in this case. It was very decidedly higher in 1900 than it was in 1901.

Defendant argues that whatever rise in prices it made was slight. The uncertain recollections of witnesses as to what took place at a particular period 13 or 14 years before they testified are not usually of great value. More importance may justly be given to the recorded facts of actual transactions then made; but, for the understanding of the real significance of some of them, more knowledge as to all the surrounding circumstances is required than can be now easily obtained. It is not worth while to go into such inquiries.

## Competition Revives.

What happened shows that prices were put up to a point which made it apparently profitable for outsiders to start making cans with any antiquated or crude machinery they could find in old lumber rooms or which they could have made for them in a hurry, or even to resume can making by hand. The evidence on these points is absolutely conclusive. Can making became attractive. Any number of people began to make cans, or, at least, began to try to make them. Perhaps in some cases the prices which had been paid for can shops made them hope that if they could get a can shop they would be able to sell out at a figure which would make them comfortable for the rest of their days. At first, the defendant seems to have thought it would try to buy them out, and it bought a few of them, as already has been mentioned; but in a few weeks, if not in a few days, it became plain that such policy was impossible. In the first place, its money was gone. It still had between $2,000,000 and $3,000,000 of stock which might be sold, but there was already doubtless so much of that stock seeking a purchaser that it was becoming more and more difficult

to keep quotations up to the issue price. There were too many new shops to buy them all, and, as it has turned out, it was easy enough to start some more. The real remedy would have been to reduce the price of cans. If defendant had not been under the necessity of realizing large and quick profits, doubtless it would have done so. Its mere cost of operation, excluding any allowance for capital investment, must have been below that of many of its poorly equipped competitors, who then rushed into the field. But, if prices had been reduced, the idea that there was a speedy fortune to be made by defendant's stockholders would have been too speedily dispelled. Other devices were resorted to. The attempt to keep up the price of cans was persisted in. In an effort to do so, the defendant itself sent brokers into the market and bought some millions of cans from its rivals. Some of these were very badly made, as was to be expected from new shops, equipped with wretched machinery and hastily rushed into business. These cans were stored for a while, and ultimately such of them as were salable at all were sold for what they would bring. Possibly these purchases did keep up the price longer than would otherwise have been the case.

### Raising Prices During the Canning Season.

Following the practice which had been common before its day, and to put an end to which it now says was one of the principal objects of its formation, defendant raised its prices as the canning season of 1901 advanced, until they reached the maximum in August, September, and October of that year. Taking the price of tin plate into account, they were then roughly about 60 per cent. greater than the prices which from 1910 to 1913 prevailed, and for which cans had been purchased in a number of the years preceding defendant's formation. The defendant seems to have realized its mistake, and the 1902 prices were materially lower. In 1903, prices were again rather sharply raised, but by the close of the packing season of 1904 they had been brought down to a trifle above that which has been their subsequent average. By that time the opportunity absolutely to monopolize the market had been lost. It is true that many, apparently the great majority, of the people who in 1901 rushed into can making were forced out of business, so soon as prices came down from the abnormal heights to which they had been lifted. The record contains quite a suggestive list of such concerns whose history was like that of the seed sown on stony ground; but there were others who went into the business with more resources, both in money and brains, and, consequently, with greater staying powers. The demand for can-making machinery had stimulated the supply, and, while the so-called "independents" were not until 1907 able to get the best automatic machinery, they could after 1902 obtain far better machines than were accessible to them in 1901. Moreover, tin plate mills, other than those controlled by the Tin Plate Company, were being established. Those who were minded to stay in the can-making business as competitors with the defendant were free by this time from the apprehension that it could cut off their supplies of either tin plate or machinery. It

doubtless could get the former cheaper and the latter better than they could, but it was greatly overcapitalized, and they might stay in the struggle with some reasonable chance of surviving.

## The Legal Situation in Defendant's Early Years.

Such is the history, as the record discloses it, of the genesis of the defendant, such the story of its organization and of its conduct during the first years of its existence. It is clear an attempt was made both to restrain and monopolize the interstate trade in tin cans. Trade was restrained. For a moment a substantial monopoly was obtained, and in many sections of the country, long maintained. So far as one can judge, it might have been held almost or quite everywhere, had not the very determination to make it ostensibly perfect at the start, combined with the reward which the promoters felt they were entitled to take at the beginning, compelled it to attempt a premature harvesting of the monopolistic fruit. Upon such state of facts, had the government then asked for a dissolution of the defendant, it is difficult to see how the demand could have been refused. No matter what view might have been taken on any of the questions now still open to dispute as to the construction or application of the Anti-Trust Act, there was a restraint of competition and an attempt to monopolize, which, so far from being merely incidental to any legitimate purpose, had themselves put obstacles, and unnecessary obstacles at that, in the way of attaining the benefits which larger capital, better organization, and more efficient business methods might have naturally brought about.

## The Recent Conduct of Defendant.

Beside charging the defendant with in effect fixing the price of cans throughout the country, the government specifies certain unfair practices of which it says the defendant has been guilty, and alleges that there are still others of which the government has no certain knowledge, but which would be developed in the course of taking the testimony.

Before considering the question of how far the defendant does determine the prices at which cans are sold, it will be more convenient to inquire to what extent, if at all, the evidence sustains these other charges of the government. At the outset, it may be said that the testimony has disclosed nothing in the recent conduct of defendant, other than that which the government particularizes, to which any serious exception, or indeed any exception at all, can be taken.

## Charge That the Can Company Compels Consumers to Take all Their Cans from it Under Penalty of Getting None.

The government's petition charges that the defendant induces or compels its customers to enter into long-time contracts to purchase cans exclusively from it, and prevents them from dealing with such independent establishments as exist, by threats, among others, that it will cancel contracts it already has with them, and will refuse to sell more cans to them. It is true that defendant sells a large portion of its cans under contracts by which, for a definite time, it agrees to

230 F.—56

furnish, and the customer to buy, all of the cans he will need in his business. Many of these contracts are for two or three years, some for as long as five.

### Contracts for Season's Requirements.

Prior to the formation of the defendant, packers' as well as general line cans were almost exclusively sold under contracts which required the seller to furnish, and the buyer to take, a certain definite number of cans within a certain limited time, at a fixed price. There might be some leeway as to quantities. It is possible that sometimes the contracts, either by their terms or by the way in which the parties acted under them, really amounted to a bargain to supply at a fixed price a packer's requirements for the season. Such cases were, however, rare. The rule was otherwise, and under it the packer was often put to great inconvenience, and not infrequently suffered serious loss. Sometimes strikes among the can-maker's employés, a breakdown in his machinery, or his inability to get tin plate, prevented prompt delivery. More often it turned out the buyer had not bargained for all the cans he needed. Until the season was well advanced it was not possible to know how many he would require. He was usually under contract to take all the tomatoes or other fruits or vegetables raised by certain farmers and growers. Too much or too little rain, destructive hailstorms, early frosts, might cut down the crop. None of these troubles might be experienced, and the output might be large. The canner could seldom afford to carry over any great number of cans from one year to another. He was therefore afraid to bargain for more than he felt reasonably sure he could use. When they did not suffice, he was forced to buy at the prices then prevailing. Usually the same crop conditions which sent him into the market simultaneously drove others there. The can makers, as a rule, sold the cans for which contracts were early made at very low prices. They looked for their profits to the late season demand. Then the canner had to have cans, and frequently had to take the first he could get, no matter what was asked for them. The difference in price between cans bought early and those bought late was often great.

Not long after the defendant was formed, it made some contracts by which it undertook to supply a packer with all the cans he would require for a season at a price which was to remain fixed through the year, no matter how many he took. Many of these contracts contained provisions by which the cans taken early in the year would be furnished at a somewhat lower price than those which were not ordered until late in the season; but the prices, whether they varied with reference to the time of delivery or not, were fixed in advance. So far as one may judge from the record, the inauguration of this practice was more accidental than intentional. As already stated, during the first year of defendant's existence, it followed the old custom of the trade of raising its prices as the season progressed. During March and early April, it sold three-pound cans at $24 a thousand. On April 25th it advanced them to $24.50; on May 1st, to $25. Another dollar was added on the 1st of June, and still another on the

1st of July; the price then being $27. On August 1st, when the tomatoes were beginning to ripen, $3 a thousand more was put on, so that $30 was asked. That figure continued until November 1st, when, Jack Frost having presumably put an end to most of the demand for packers' cans for that season, a drop of $7.50 a thousand was made. $2.50 more was taken off on December 1st, so that the price when packing was going on was 50 per cent. greater than it was after the season had closed.

No clear statement of the circumstances under which originated the practice of contracting to furnish a packer with all the cans he would need for the season, at a price determined in advance, is found in the record; but its advantages from the standpoint of the consumer were so great that it speedily went into almost universal use, and, after defendant's first year, there does not seem to have been anything more than a very moderate difference between its midwinter and its midsummer prices. Under the old method of selling, in years of bounteous crops, the canner would be required to pay for the extra cans he needed a price very much in excess of that ordinarily prevailing, while in years of scarcity of canable fruits and vegetables he would have cans on his hands which could be sold only at a material loss. Many consumers have testified. They are practically unanimous in their approval of the new method. They know in advance what the cans will cost them, and make their own contracts and arrangements accordingly. Only a large company can carry on business and sell cans in that way. Probably it can only safely do so when it has a number of factories located in different parts of the country. A shop, the possible production of which could not exceed a certain figure, could not well afford to do all its business under such contracts, because, if it did, it would either have to limit its engagements, so that in years of ordinary consumption it would sell only a percentage of its possible output, or else would expose itself to the possibility of heavy damages in years when there was a large demand because it had contracted to furnish more cans than it could make. The larger the plant and resources of any particular can maker, the less dangerous such contracts would be to it. Even so, there would be risks, and serious ones at that, unless he had factories in different canning sections in which it was not likely the crop conditions would be precisely the same.

## Contracts for More Than One Year.

From the record it appears doubtful whether the practice of making contracts for more than one year originated with the defendant or with some of its competitors. In such agreements the seller finds it necessary to protect itself, and also its customers, by providing that the price shall rise or fall with the rise or fall of the price of tin plate. An inducement usually given by the defendant, and such of its competitors as make these long-time contracts, is the reduction in price of 25 cents a thousand from the regular list price of cans. This discount, which never amounts to more than 2½ per cent. of the price, is relatively as well as absolutely small. If a man wants to make a contract for a long term, he will probably prefer to make it with a

strong concern rather than with one which is financially not so robust. It is therefore possible, or indeed probable, that the coming into fashion of these long-term contracts has in that way been of more advantage to the defendant than to its competitors; but, if so, the result appears to have been accidental rather than premeditated.

The charge of the government that the defendant refuses to sell persons who will not make long-term contracts with it, or refuses to sell those who buy any of their cans from its competitors, is disproved. Probably a hundred or more witnesses from different parts of the country testified that though they were under contract to take their cans from competitors of the defendant, and had in fact been taking their cans from such competitors for years, the defendant was always ready and willing to sell them cans when any accident or mistake, either at the plant of the competitor, or on the part of the transportation lines, left the consumer unsupplied. Such cans were sold them at the regular list prices; that is, at the prices the defendant charged those who bought exclusively from it. Indeed, it would appear that some of the defendant's competitors conduct their business upon the assumption that defendant will do this very thing. They feel they can safely agree to furnish many customers with all the cans they will need in a season, because, if they are asked for more than they can make, they know at what price the extra amount needed can be obtained from the defendant. In that way they are able in advance to calculate accurately the maximum risk they will run.

### Effect Upon the Trade of the Preferential Prices at Which Defendant Obtained Tin Plate.

The government alleges that the same persons, in the main, who organized and always dominated the defendant, organized the American Tin Plate Company, since absorbed by the defendant the American Sheet & Tin Plate Company. It says some of them are now directors of the United States Steel Corporation, which owns substantially all the stock of the American Sheet & Tin Plate Company. These allegations may, for the purposes of this case, be taken as established. It also may be admitted that, at the time the government's petition was filed, the defendant the Tin Plate Company produced, if not 60 per cent. of the tin plate consumed in the country, as the government alleged, at least 50 per cent. as it itself admits, and that it is by far the largest single producer of tin plate.

Down to some months before the institution of these proceedings, the Tin Plate Company was under covenant to give the defendant its tin plate at a fixed number of cents a base box less than it furnished such plate to any one else. Since April, 1913, it sells the defendant below its published list prices, but it no longer binds itself to require all others to pay those prices. Whether it has exercised the liberty thus reserved, the record does not show. The preferential rebates received by the defendant from the Tin Plate Company in the period from 1902 to 1913 amounted to the large sum of $9,000,000. The answers of both the defendant and the Tin Plate Company claim that these transactions were normal and the allowances were those

which would naturally be made to an exceedingly large consumer. The facts seem to show that the parties themselves did not so regard them. Tin plate was billed to the defendant at the fixed list price, and the rebate was subsequently paid. Great precautions were taken by the defendant to conceal the facts from most of its bookkeepers, and even from some of its officers. The rebates, when obtained, were entered upon the books of the defendant in such a way as to conceal their origin. During the early years of defendant's career, its competitors in most, if not all, instances, were compelled to pay the full list prices. It has often been possible, in recent years, for such competitors as were considerable consumers, and who were familiar with the conditions and knew how to bargain to advantage, to buy tin plate from the so-called "independents" at some cents below list figures. This was especially true, of course, at times when the demand for tin plate was relatively small. The amount of reduction they could secure depended upon circumstances and frequently, probably usually, has been less than the amount of defendant's preferential. It has only seldom been more. The effect of such a bargain as that which long subsisted between the defendant and the Tin Plate Company may be very far-reaching. For years the defendant was under contract to sell the largest fruit packers on the Pacific Coast cans cheaper than it sold them to anybody else. For eleven years it bought its tin plate from the Tin Plate Company under an agreement by which it got it at a lower price than any other consumer. The Tin Plate Company itself is a subsidiary of the United States Steel Corporation. To make the chain complete, all that would seem necessary would be a company which operates a large number of wholesale and retail grocery stores, and to have that concern make a bargain with a canning company enjoying the special preferential rates. Whether such a chain, if established, would do any harm, this record does not require to be decided, and furnishes little data upon which such a decision could be based. As already stated, the preferential ended in April, 1913, some seven months before this suit was brought. The defendant still buys its tin plate at prices lower than the quoted list prices of the Tin Plate Company; but it no longer has a right to require the Tin Plate Company to allow it such a reduction below any price at which the Tin Plate Company may sell to others. The government claims that its investigation of the status of the defendant had begun before April, 1913, as the defendant knew. It says that the change in the agreement was the result of such knowledge. The preferential contract had, however, in fact been terminated before this suit was brought. It will be unwise to decide as to the legality or illegality of such an agreement in any case which does not make it necessary to do so. If any such exclusive privileges have been granted in form or in fact since the 15th day of October, 1914, they will be subjected, not only to the provisions of the so-called "Sherman Act," but also to those of the second section of the act of the date mentioned (Act Oct. 15, 1914, c. 323, 38 Stat. 730), in so far, if at all, as the same may be applicable.

### Making Cans for One's Own Use.

The government further charges that, because the defendant buys its tin plate.cheaper than anybody else, it has extended its control over the can trade by selling cans to packers who make their own, at prices lower than those at which they can make them. Unquestionably, defendant has sold cans to some users at prices which made it cheaper for such users to buy from it than to make their own cans. It does not appear that in any of these cases the defendant sold its cans below its regular list prices, and, in most of the cases in which users found it more profitable to buy from it than to make their own cans, the situation would have been the same had it paid the same price for its tin plate as everybody else. Had it paid as much as other can makers for its tin plate, it might have charged more for its cans. If it had done so, there are doubtless instances in which it would still have paid some canners to make their own cans, although, at the price which actually prevailed, it did not.

The ordinary packers' cans are not hard to make. They do not require a high degree of skill in the workmen. While the cost of the best machinery for making them is now much greater than it once was, it is, after all, not very large. Nevertheless there are many packers who are not able to make their own cans as cheaply as they can buy them, either from the defendant or from its competitors, or else do not save enough by making them to lead them to think it worth while to take the trouble and risk of so doing. The fact that in a number of instances can users have ceased to make their own cans and bought them from the defendant proves little. Sometimes it is true the defendant has purchased the can-making machinery belonging to such consumers of cans. The amount paid may not infrequently have been more than the machinery would have brought in the open market. It does not ever appear to have exceeded the cost to the customer and usually was less. In such transactions, it is difficult to see anything that might not well be done by any can maker who thought he could thereby for some years secure the patronage of a large customer.

### Defendant's Concealment of Its Control of Its Subsidiary Companies.

The government's petition charges that the defendant has concealed its control of some of its subsidiary companies, and has caused them to be carried on as if they were among the number of its independent competitors.

An attempt was made to show that this was the case with the Sanitary Can Company and the Union Can Company of Rome, N. Y. The stock of each of these concerns was bought by the defendant in 1908. At that time public announcement was made that the defendant had acquired an interest in them. It is true that the extent or character of that interest was not stated, and that the defendant maintained the separate corporate existence of each of them and operated them largely through their own officers and employés; that, under such circumstances, these companies have since advertised their wares without saying anything about their connection with the defendant scarcely furnishes ground for criticism.

The like cannot be said as to what it did or caused the American Stopper Company to do. Since 1905, that company has been a subsidiary of the defendant. The fact was not publicly disclosed until 1909. During the intervening four years, the Stopper Company advertised itself as the largest maker of tin boxes "outside of the trust"; the trust, of course, being the defendant. Deliberate deception was also for years employed to conceal its ownership of the Union Stockyards Can Company of Chicago. Defendant's control of this concern dates from November, 1906. Down until the close of 1909, if not longer, it was operated as an independent company. During this time one of the defendant's high officers conveyed its orders to the nominal head of the dependent company. By his directions, the connection between the two was kept secret. There were those in the trade who, nevertheless, guessed that there was some relation between them; but, as its manager testified, he lied down their suspicions. The reason for all this mystery was the usual one in such cases. The defendant wanted to use the Stockyards Can Company to fight its general line competitors in the Chicago district, while still maintaining its own prices. The manager of the subsidiary testified that, if he could get the trade of such competitors without cutting prices, he was told to do so, but, if a cut was necessary, he was to make it.

There can be no question as to either the moral or legal character of such methods. Laying aside all ethical considerations, the wonder always is that a great company like defendant does not see that it cannot afford to be caught in such a position, and, in the long run, caught it is likely to be. The loss of dignity and prestige in the public eye must usually cost more than was gained, even if nothing worse happens. It is like enough to suffer from lowering the moral tone of its own employés. The practice referred to, however, ceased three years or more before the institution of these proceedings.

### Subsequent Purchases of Can Plants.

The government charges that defendant, since its organization, has, by purchasing a number of competing plants, continued its attempt at monopoly. Defendant has bought control of 12, 2 of them before January 1, 1903, the other 10 between April, 1905, and June, 1909. None were taken over in the 4½ years immediately preceding the filing of the petition.

The first bought was that of the Andrews-Bones Company of Omaha. It was a small concern. The price paid was little above its apparent value. The transaction was without significance.

The lease of the factory of the Union Can Company of San Francisco, for a term of five years from January 1, 1903, was a more important transaction. Norton had sought an option upon it. He failed to get it, because the California Fruit Canners' Association, which was and is a large consumer of cans, in self-defense, as it thought, bought 60 per cent. of the company's stock. About a year after defendant's organization, it and the Canners' Association reached an understanding. The association then agreed that for five years it would buy all

its cans from defendant. The latter promised to charge every other canner on the Coast, with two exceptions, $1 a thousand more than the association paid; the discrimination against the two exceptions to be but half as great, or only 50 cents a thousand. The association has apparently ever since bought its cans from the defendant. The lease of the Union Can Factory was one of the terms of the alliance between defendant and the association. Somewhere about 1908 that plant was abandoned. The defendant bought some of its machinery; the rest was stored.

It is unnecessary to inquire closely into the nature and effect of this incident, or series of incidents. Giving them all the significance for which the government contends, they show nothing more than that as late as January 1, 1903, defendant was still attempting to accomplish its original illegal purpose, although it was working to that end with much less thoroughness and system than it once had used.

The next purchase, made in the spring of 1905, was that of the American Stopper Company of Brooklyn. That and the acquisition of the Union Stockyards Can Company of Chicago in November, 1906, were made in part at least with the purpose of using those concerns in one of the least defensible ways in which powerful corporations have waged war upon their competitors. In each case, as already stated, the fact of defendant's ownership was for years denied, and one, if not both, of these subsidiaries was put to the same use as the fighting ships which figure in United States v. Hamburgh-American S. S. Line, 216 Fed. 971. From any other standpoint the purchase of the Union Stockyards Can Company was unimportant. It was a feeble concern, without any apparent power to continue effective competition.

The Stopper Company was a much stronger organization. Its origin was modest enough. It was formed in 1900 to make, as its name indicated, bottle closures. In 1901, after the organization of the defendant, it began manufacturing decorated tin boxes. Its going into this line was in part the result of the high price to which defendant had at that time raised the price of cans. The Stopper Company's business grew and flourished. In 1905, when its real estate and machinery were worth perhaps a quarter of a million, its annual consumption of tin was about 20,000 base boxes a year.

In November, 1905, the Norton-Edgar Can Company was purchased. This concern was organized by one of the numerous Norton brothers. It manufactured paint and varnish cans principally. It started business early in 1903, and less than three years afterwards was sold out to the defendant. It never was prosperous.

In the month of November, 1906, the United Can Company and the Federal Can Company, both of San Francisco, and the Kendall Can Company of Astoria, were acquired. The two former were managed by a gentleman who had once been in defendant's employ. In May, 1904, he and his associates bought the United Can Company. It was then a small concern. Under their management it flourished, and by 1906 was selling 40,000,000 cans a year. They took over the property of the Federal Can Company, and with it certain exclusive licenses to operate in the Pacific Coast States under patents belonging to

the Max Ams Machine Company. The Kendall Company was a sub-licensee of the Federal Can Company. The purchase of these three companies and their exclusive licenses materially strengthened defendant's hold upon the can trade of the Pacific Coast.

About January 1, 1909, the Union Can Company and the Utica Industrial Company, both of Rome, N. Y., as well as the New Hartford Canning Company of New Hartford in the same state, were acquired. All three were closely allied. They were apparently controlled by Sanford F. Sherman, a brother of the late James S. Sherman, then·Vice President elect of the United States. The New Hartford Canning Company was primarily engaged in the business of canning fruits and vegetables. Since 1880 it had made its own cans and sold the surplus. Norton had attempted to get it for the defendant, but had failed. The Union Can Company was not organized until 1906. The two concerns together annually consumed about 90,000 base boxes of tin plate, and sold about one-half of the packers' cans used in the state of New York. The Utica Industrial Company was principally engaged in constructing machines under patents it owned. These patents were for the invention of one Charles W. Graham, who was in the company's employ, and who appears to have had quite a genius for developing automatic can-making machinery. The three companies were prosperous, but the volume of their business compelled them to borrow money. Mr. Sherman had to indorse their paper. He wished to be free of the burden. He opened negotiations with defendant and effected a sale for $275,000, a price apparently liberal, perhaps even generous, but far removed from the extravagant sums which defendant had formerly paid.

The New Hartford Can Shop and the machine shop of the Utica Industrial Company were dismantled, and some of the obsolete machinery of the former was junked.

It is perhaps worth while to note that, of these 12 concerns, only two made cans prior to March, 1901. Norton had tried to get both of them. He failed because their owners were large can consumers and feared to surrender the control of their can supply. It is, of course, obvious that these purchases of a dozen plants during a period of some seven years do not even tend to show that the defendant from 1902 to 1909 made any attempt to secure all or a greater part of the can-making plants of the country, as in 1900 and 1901 Norton and those for whom he acted did. In many, if not in most, of the cases in which the defendant did buy, the sellers sought it. The effect of the purchase was the same, no matter who began the negotiations; but, in judging defendant's intent, the fact that the owners came to it, and not it to them, is significant.

### Alleged Monopolization of the Sanitary Can Business.

The defendant made one other purchase. It was in some respects more important than any or all of the others, for through it defendant secured the prominent place it still holds among the makers of so-called "sanitary cans."

A packer understands a can by that name to be one in which the whole top in one piece is put on the can after the latter has been filled,

and in which such top is secured in such a manner that the medium used to seal it hermetically does not come in contact with the contents of the can. Such cans had been used in Europe for years before the formation of the defendant. Max Ams was a firm engaged in the business of putting up canned fish, jellies, condiments, etc., and had a large export trade. Its European customers objected to the hole and top cans sealed with solder then almost in universal use in this country. The rubber gaskets employed in Europe for sealing cans were not available here, and, if they had been, the time and cost of inserting them would have been a serious obstacle to their use. One of the firm invented a liquid compound which could, in connection with machinery, types of which had already been developed in this country, be used to seal the cans. About 1904, he thought his experiments had succeeded to an extent sufficient to justify him in exhibiting his methods at the packers' convention of that year. In 1902, the Max Ams Machine Company was incorporated and began to manufacture, or rather to adapt, machines for closing such cans. The defendants Bogle and Cobb were connected with the Cobb Preserving Company of Fairport, N. Y. They became interested in sanitary cans and, at the instance of Ams, began to manufacture them on a larger scale than he was equipped to do. They were canners, and they made the cans for their own use and sold the surplus. The consumption of sanitary cans increased. In 1904, they organized the Sanitary Can Company, and thereafter their business in making and selling sanitary cans grew from about $150,000 to nearly $2,000,000 four years later. They had troubles. Things did not always work right. A good many of their cans were defective, or the packers did not know how to use them and claimed they were. They had to pay out large sums in damages. They branched out largely. They built additional factories in different parts of the country. The very rapidity of their growth imperiled their financial condition. Not only were the resources of the company itself strained, but so were those of the individuals largely interested in it. Along came the panic of October, 1907. The men at the head of the company, and who had indorsed its paper, became somewhat alarmed for their future. They feared they had on hand more of a task than their means would enable them with safety to handle. They looked about for a possible purchaser. The defendant naturally occurred to them. The fact that it was the largest concern in the business made them, as a few months later it made Sherman, turn to it. In periods of stress, it frequently happens that the largest competitor in any line of business is the only possible purchaser for one of its smaller rivals, who has become financially involved. As, for example, the United States Steel Corporation was the only concern which could in a hurry and in a time of panic buy the Tennessee Coal & Iron Company, when those interested in the latter had to have instant relief. The largest organization in any line of business may not unnaturally grow otherwise than by the use of what ordinarily would be thought of as its competitive advantages. The fact that any of its competitors who feel they must sell are most likely to make it the first offer, and that usually acceptance is for it a far less se-

rious matter than it would be for almost any one else, is one of the causes which contribute to such expansion.

At the same time, defendant entered into certain contracts with the Max Ams Machine Company, by which it secured for some years the exclusive right to use the latter's closing machines. Of what significance are these transactions? The defendant, before they took place, had begun the manufacture of sanitary cans, which of course were sold in competition with those made by the Sanitary Can Company. Those cans were coming into public favor. Defendant might, even if it had not been already far and away the most powerful factor in the entire can trade, have wished to secure plants which made a specialty of such cans and were fitted for their manufacture. In short, had it not been conceived in the sin of defying the Anti-Trust Law, such a purchase could hardly have been said to show an intent to restrain competition or promote monopoly.

The weight which should be given to these various purchases and to the fact that similar transactions are like enough to take place in the future, whether defendant specially wishes them or not, may be most profitably considered in connection with the government's contention that the defendant's size and power is so great that through them it dominates the industry, and, because such size and power were in the first place illegally acquired, the court must now take them away.

### Prices of Sanitary Cans.

The government charges that, through the control the defendant has acquired over the sanitary can business, it is able to exact, and does exact, for those cans a higher price than for other kinds of packers' cans, although they cost no more to make. Sanitary cans are sold at higher prices than packers' cans of like sizes, and it is probably true that they are no more expensive to manufacture. It is, however, the custom of can makers to furnish, to purchasers of such cans, can-closing machines at nominal, or at all events at very low, rents. There has been in the last few years a rapid improvement in these machines. Those in use one year frequently became obsolete a year or two later. It is therefore quite possible that the margin of profit on sanitary cans is in fact no greater than on the old hole and top cans. It would not be surprising, however, if the reverse were true. In most lines of production, greater profits are made on comparatively new things than on those which have been known and used for many years. It does not appear that any special significance should be attached to the figures at which sanitary cans are sold.

### Defendant's Control of Prices.

The government alleges that, ever since the defendant was formed, it has controlled, and at times has increased, the general market prices of cans. It is charged that not only does it fix the price of the output of the plants controlled by it, but that so great is its predominance in the industry that those prices are followed of necessity by the independent manufacturers, and thus all substantial price competition is eliminated. It is said that defendant has exercised, and at the time of the filing of the petition was still exercising, this control to lower

or raise unduly and arbitrarily the price of its product. There is no question that since 1901 the defendant has very largely fixed the price at which packers' cans have been sold throughout the United States. It has competitors who now sell approximately one-half the cans which are sold in the country. There is no evidence of any price agreement between it and them. There is no reason to think that there is on this subject any understanding of any kind, however vague or indefinite. Nevertheless, the prices it fixes are the standard prices from ocean to ocean and from the lakes to the gulf. It is impossible, except under very peculiar circumstances in extremely limited amounts, and during the shortest periods, for anybody to get more for packers' cans than defendant charges. Its largest competitor is the Continental Can Company. The latter sells nearly one-fourth of the cans not sold by defendant. So far as packers' cans are concerned, it appears always strictly to follow the defendant's prices. The record mentions a few instances of alleged price cutting by the Continental Can Company. These instances are so rare and so obviously opposed to the general trend of its policy that it appears probable that with one exception the witnesses who testified as to them misunderstood the facts or did not accurately recall them. It did sell the makers of Campbell's soups, who were very large consumers, at perhaps 20 cents a thousand below defendant's prices. The Continental Can Company was organized in 1904 very largely by the Edwin Norton who played so conspicuous a part in starting the defendant. There is no evidence that the Continental Can Company's strict adherence to the prices fixed by the defendant is the result of any agreement or understanding. It is possible that it is due entirely to the belief of the well-informed managers of the Continental that a trade war carried on by cutting prices would not be to its advantage. A number of the smaller competitors of the defendant, concerns the total output of each of which does not exceed perhaps one-twentieth of its, sell their cans at defendant's prices when they can, and, when they cannot, they cut those prices anywhere from 25 cents to $1.50 a thousand. They never drop much lower. It may be that their cost of production prevents. It may be that, if they named prices sufficiently attractive to draw much trade from defendant, they would get more than they could handle. If they attempted rapidly to extend their facilities, a sudden drop in defendant's prices might catch them in a position in which they would be in deadly peril of financial ruin. They never name their prices for the year until the defendant's have been made public. On the other hand, the potential, if not the actual, competition to which defendant is exposed, prevents it from arbitrarily fixing its prices at a higher figure. The experience which it had at its formation has taught it that such a course is, from its own standpoint, unwise and may be disastrous.

It is not possible to arrive at a definite conclusion as to the prices of general line cans. They are of many different sorts, sizes, and shapes. Each user is likely to insist on a can adapted to his particular requirements, real or fancied. The publication in advance by the defendant, or by anybody else, of prices for such cans, would be im-

practicable, and in fact is never attempted. The consumers make their own bargains with the various can factories in what manner and for what length of time best commends itself to their judgment.

The evidence shows that sometimes the defendant offers general line cans at prices lower than any of its competitors, and sometimes one or more of its competitors names prices below its. While as a result of defendant's size and the wide distribution of its factories its action is perhaps the most important single factor in determining the price of general line cans, it does not fix and control the prices of such cans, to anything like the extent it does those of packers' cans.

## How Far Defendant Has Served the Industry.

Thus far consideration has been chiefly given to the government's charges against the defendant. Some of these have been held not well founded. It has been said that others are made out.

Defendant has directed much of the nine volumes of testimony it has offered, to show that whatever criticisms might be made as to the way in which it was formed, and to certain of its isolated acts since, it has on the whole served the can trade well, and that its dissolution would do harm and not good. There is no room for question that since 1901 there have been many improvements, not only in can making, but in can selling and in can delivery as well, and that these improvements are greatly appreciated by all who buy cans from can makers. There is the usual difficulty, in such cases, in telling how much of these good things are because of that which defendant has done and how much would have come about if defendant had never been thought of.

## The Tendency of Can Prices.

By 1904, if not earlier, the defendant had definitely abandoned the policy of charging prices which to the consumer seemed unduly high. It is natural, nevertheless, to ask whether since that time prices have been lower or higher than they would have been had it never come into being. The record does not give any certain answer to this question. A great many consumers of cans testified that the price has tended downward. Up to the time of the closing of the evidence in this case, that was generally true. There were fluctuations, and the downward trend was slight; but there was such a trend. A comparison of the price of tin plate and of cans from 1897 to 1913 shows that the prices of the latter for 1911, 1912, and 1913 were just about the same as they were in 1897, 1898, and 1899, when allowance is made for the difference in the cost of the former. The margin between the cost of the tin plate and the selling price of the cans seems to have been as great when, as now, cans were made and sold at prices fixed by the defendant, as it was when they were made and sold by its numberless predecessors in the business. The cans have been better, in that they have been more uniformly well made. With the machinery now in use there is no reason to think it costs appreciably more to make good than bad cans. The manufacturing cost is now less than it was before defendant's formation. It is true that each

laborer employed now receives more wages than he did then, but so great has been the improvement in machinery that the actual labor cost per thousand cans is now materially less than it was 15 years ago. Moreover, as a result of better methods of manufacture, much less solder is now used, and a net saving of some importance is thereby effected. A reduction in the price of cans does not appear to be among the benefits the defendant has conferred upon the trade.

### Standardization of Sizes.

Defendant takes some credit to itself for bringing about a standardization in packers' cans, so that a No. 1, a No. 2, or a No. 3 can, of any one of the recognized types of openings, is now precisely the same, no matter from what shop it comes. A good deal of progress in this direction had been made before defendant was organized. The first effect, not of its formation, but of the policy adopted by it in its earlier history, was probably to retard rather than to accelerate this tendency. The prices it quoted brought about, as has been seen, an opening or reopening of a number of shops poorly fitted to make good cans. The owners of such establishments probably gave little thought to standardization or to any similar problem. Subsequently, the influence and example of defendant made greatly for uniformity. It is, however, probable that, even if it had never come into being, the pressure from the canners and other sources would e'er this have resulted in the general establishment of the standards now in use. It is very possible that it would have taken longer than it did.

### Better Cans.

Defendant makes good cans. It has always done so, at least after the first few months of its existence. The impression produced by the testimony is that it has been more uniformly successful in so doing than perhaps any of its competitors, although the larger and more responsible of these have, in recent years, habitually turned out thoroughly satisfactory packers' cans. The same may be said as to the more generally used of the general line cans, such as those for coffee, lard, or varnish. When it comes to designing and making cans to meet special wants or peculiar tastes, conditions are somewhat different. The defendant has usually at its command a wider range of expert capacity in dealing with the problems which may arise, although of course on any special occasion, any one of its rivals, even a very insignificant one, may happen to solve them more satisfactorily. It has a more varied line of machinery. It is its policy to spare no trouble nor, within reasonable limits, expense to meet its customers' wishes. It is therefore not surprising that some users of certain sorts of general line cans feel that it can be safely depended on to make what they want. Some of them have reason to believe, or to know, that not every one of its competitors can be, and, as they are not certain that any of them can, it gets the business at the same or even a little higher price. Many concerns use many different kinds of cans. Some, but by no means all, of these, like to have all their cans from the same maker. In such cases it not infrequently happens

that the defendant is the only one who will, or perhaps can, bid on the whole order.

It is impossible to say how much of the improvement in the quality of cans and in adapting them to varied uses is due to the defendant, and how much to other causes. It is, however, certain that its influence has been an important factor in bettering these conditions.

## Promotion of Scientific Study of Canners' Problems.

The defendant claims, with much reason, to have been the first of the can makers systematically and scientifically to study canners' problems, with a view to discovering the causes of damage to and deterioration in canned goods. It says it has done more in that direction than any of its competitors, or all of them together. A number of years ago the defendant established a laboratory for the investigation of such matters. It has always been ready and willing to use the resources of this laboratory to aid canners, without expense to the latter and whether they bought their cans from it or not. When, some years ago, the National Canners' Association made up its mind that it would like to establish and maintain a well-equipped and efficiently managed laboratory at Washington, the defendant, and for that matter its principal competitors, furthered the project by contributing liberally, apparently in some rough proportion to the number of packers' cans sold by each.

## Contracts for Season's Supplies.

From the canner's standpoint, the most important respect in which the condition of the industry has, since 1901, changed for the better, has been the practically universal substitution of the agreement to supply all cans needed by a packer during a particular season for the theretofore existing practice of contracting for a definite number of cans. This change has been highly beneficial. It would have been difficult, if not impossible, to have brought it into general use, so long as the can factories were on the average as small as they were in the last century. All the larger and stronger can makers in the business now follow it. As has already been intimated, it may be doubtful whether some of these could safely do so to-day if they did not feel that, even in seasons of unusually and unexpectedly large crops of cannable products, the defendant would be able and willing to supply their customers at reasonable prices with any cans which they might not be able to furnish.

## Prompt Deliveries.

Almost every canner of food products, out of the hundreds who have testified in this case, and many who use cans for other purposes, are emphatic as to the supreme importance of prompt deliveries. Many users of cans have limited storage facilities. They cannot take in many at a time. A delay in the arrival of cans may mean to them the entire loss of the product which was to be packed. Fire, flood, or other accidents may put a stop to the operation of any one can fac-

tory. The defendant has many shops, most of its competitors but one. The probability of its delivery of cans being altogether prevented by a factory accident is therefore almost negligible. Prompt delivery at short notice cannot, however, be assured unless the can factory is near the place of consumption. If there is a long railroad journey between, accidents and mistakes on the lines may postpone the arrival of cans which have been shipped in due season. The testimony shows that for this reason users of cans often prefer to deal with a neighboring factory, whether of the defendant or one of its competitors, in preference to buying cheaper elsewhere. The defendant has always given special attention to insuring prompt deliveries, and apparently has been rather unusually successful in so doing. Moreover, it stands ready to do its best to furnish cans on the shortest notice to any one who wants a carload or many carloads, and at its published prices. The failure of prompt delivery from one of its factories, or from a factory of one of its competitors, is no longer by any means so serious a matter as such an event formerly might have been. From one or the other of its shops the defendant is usually able in brief space to place the cans where they are needed. No concern which had not a number of plants and ample resources, both in men and money, could have done what the defendant has accomplished in protecting can users against serious delays in delivery. Perhaps this has been its most valuable service to the trade.

## Storage Agreements.

Cans are bulky articles. In most sections of the country the packing season lasts but a few months, and in some but a few weeks. Can factories can, or course, make the best use of their facilities by running on full time all the year round; but, if they do, they must provide expensive storage facilities for the cans they make in the six or eight months of the year in which there is little or no use for them. When everybody wants them at once, loading and switching facilities are likely to be overtaxed. On the other hand, all canners necessarily have to have some place in which to store part of their products until they are able to sell them. Such space may well be used, before the packing season, for the storage of empty cans. At some packing houses, storage facilities are limited. At others they are quite extensive. A packer of the latter class can, early in the year, conveniently take in a part at least of his season's supply. Before defendant's day, can makers sought to induce packers to do so by selling cans for winter delivery at decidedly lower prices than they would make if the cans were not to be shipped until summer. Many packers were not and are not able to avail themselves of such a proposition, which moreover is now less attractive than it formerly was, because the difference between the off-season's and mid-season's prices is, as a rule, much less than it was 17 years ago. Many packers cannot take in their cans long before they expect to ship out their finished products because, by the custom of the trade, cans are sold for cash on delivery; that is, they are shipped draft with bill of lading attached. It has now been for some years the practice of defendant and some of its stronger com-

petitors to solve the problem, in part, by storing upon the packer's premises the whole or a part of his season's supply. The arrangement takes the form of a lease by him to it of storage room. The rent it pays is usually nominal, although in a few cases it has been a little more than nominal. The defendant then ships its cans to the customer, who stores them as its property in the warehouse, or part of the warehouse of which it is in form the tenant. When he needs the cans, he takes them out in carload lots and pays for them. Then, and not until then, do the parties intend the title shall pass to him. The arrangement is one which should be useful to both parties, and particularly so to the canner if he happens to have limited capital or credit. He gets a supply of cans before he needs them. He is to that extent independent of can factory or transportation accidents. The can maker, at little or no cost, largely increases its storage facilities. The defendant may not have originated this plan, but it has extensively used and popularized it. Perhaps its only disadvantage is that it tempts canners, who are financially weak, to use cans before they pay for them, and to conceal the fact by making false reports as to the date upon which the cans were used. Sometimes bankruptcy or insolvency follows, before the cans are paid for, and various legal as well as moral complications result. On the whole, however, there can be but little question that the practice has been both convenient and economical.

### Good Feeling in the Trade.

A man or an institution may be of great service to the community, or to a portion of it, and still be very unpopular in it. He is likely to be if those who are served feel themselves compelled to do things, even although those things are for their own good. The evident good feeling between defendant and its customers and competitors proves that neither can makers nor can users feel that for a number of years defendant has tried to force them to do anything. The defendant asked a great many witnesses, a hundred or more doubtless, whether they thought its dissolution would be desirable. None of them answered yes. Some of them did not know whether it would be or not. An overwhelming majority testified that such a dissolution would be hurtful to the industry. It is true that not many of them who so said could give convincing or conclusive reasons for the opinion that they expressed, but the fact remains that nobody in the trade feels that the defendant is hurting anybody, or for a number of years past has hurt anybody, or has tried to.

Consumers of cans were, when the testimony was taken, paying less money for cans then they had frequently paid in the past. Few of them were aware that this reduction in price was due almost entirely, if not entirely, to cheaper tin plate. Prices were relatively stable. They fluctuated as to most kind of cans scarcely at all within a year, and usually but little from year to year. Users were practically certain of being able to get what cans they wanted when and as they wanted them. In short, defendant having great facilities habitually used them to give intelligent, courteous, and kindly aid. It is unmistakably popular in the trade.

The government might properly reply that those who buy cans do so for the purpose of selling their products in them. So long as they are certain that their competitors are not getting cans materially cheaper than they are, so long as they are not exposed to violent fluctuations in the prices, they are not much concerned as to whether cans could be a little cheaper or not. Their attitude of mind is perhaps illustrated by one witness who said he could make his own cans, and, as he figured out, he could make them cheaper than he could buy them; but, if he did, all his competitors would do so. Prices of their wares to their customers would go down, and in the end he would have the trouble, worry, and responsibility of making his own cans with no larger net profit. His attitude is natural enough, but it shows that the protection of the ultimate consumer cannot always be left to the middleman.

The competitors of the defendant are satisfied. It apparently is willing to sell cans at a price at which they can compete with it and still make money. As has sometimes been suggested, it seems to hold an umbrella over them. They have no cause to complain. They are growing, most of them. All the more important certainly are.

### Defendant's Share of Can Trade.

In 1913, in round numbers, one-third of the cans manufactured in the United States were made by people who used those they made. One-third was made by the defendant, the other one-third by other people who, like it, made cans to sell. There has been much testimony taken and a great deal of controversy as to whether the cans made by people who made them for sale, other than the defendant, were more or fewer than those made by it. Into that question it is not proposed to go. For all practical purposes, one made about as many as the other. It is not perceived that the decision of this case or of any material issue in it can possibly turn on whether the aggregate of cans made by defendant is a few million more or a few million less than the aggregate of those made by all other persons who make them for sale.

It is probable that, when defendant was first formed, it took over factories which at that time, or a few months earlier, made in the neighborhood of 90 per cent. of the cans manufactured for sale. In the first few months of its existence, competitors sprang up like mushrooms. The record does not give us any figures as to the aggregate volume of business done or cans made by defendant's competitors, except for the year 1913. At that time, as already stated, they sold about one-half, a little less or a little more, as you choose. The progress from year to year of some of the larger concerns is shown. The percentage of their growth has usually been higher than that of defendant, sometimes much higher; but we know nothing accurately of various concerns that made and sold cans at various times since 1901, but who no longer do so. As has already been stated, some considerable competitors have since 1901 been absorbed by the defendant. The latter's consumption of tin plate for each year from 1903 is stated in the record. The country's total production of such plate for each of those years is also given. The figures of the ex-

port of such plate do not appear to be stated, but they are easily obtained from the official statistical abstract. It is true that in such abstract the exports and imports of terneplates are not separate from those of tin plate, although the domestic production of each is separately given. Assuming that the same proportion of terne as of tin plate is exported and imported, the amount of tin plate retained for consumption in each year can be ascertained. Any possible inaccuracy in the assumption made as to the amount of terneplate going into foreign trade cannot appreciably affect the percentage of the total amount of the country's consumption of tin plate properly chargeable to defendant. This proportion varies somewhat from year to year. It was as low as 27.9 per cent. in 1906, and as high as 34.5 per cent. in 1911. The latter was a year in which there was an unusually large demand for packers' cans, a demand which the defendant seems to have been able to meet more readily than its competitors. Doubtless some of the apparent fluctuations from year to year are occasioned by the fact that the tin plate retained for consumption in any particular year may be more or less than the amount which in the same 12 months is actually consumed. However, as the defendant in each of the years 1903 and 1904 seems to have used about 30.7 per cent. of the total tin plate retained for domestic consumption, and in the year 1912, 29.9 per cent., and in 1913, 30.3 per cent., or an average for the two years of 30.1 per cent., it may be said that in a decade there has been no appreciable change in the proportion of the country's tin plate which defendant has consumed. Of course, not all the tin plate goes into cans, but almost all of it does.

## Cans Made for Use, Not for Sale.

About one-third of the cans made in this country are made by concerns who themselves use them. The government says that, in determining the degree to which the defendant has succeeded in monopolizing the trade, such cans should not be taken into account. The defendant as strenuously insists that they should be. As a technical proposition, the government would seem to be right. Cans made by persons who use them are not as cans traded in. In considering the cans which as such form part of the commerce of the country they may be excluded, and indeed, from that standpoint, must be.

If an attempt was made in a particular city to combine all the bakers, and such attempt was successful, it would probably be held that a state law, couched in the same phraseology as the federal Anti-Trust Act, except that it would be restricted to intrastate commerce, would be violated, in spite of the fact that in that city one-half or two-thirds or even three-quarters of the bread consumed was actually baked in the kitchens of private families.

Yet the fact that one-third of the cans used in the country are made by the people who use them is one of great significance. It shows that any considerable rise in the price of cans, due to other causes than the increased cost of production, or of raw material, would probably lead to two things: First, a number of the well-equipped can factories which now confine their production to the needs of

their owners would begin manufacturing for the general trade; and, second, many other consumers of cans, who now buy them, would then begin to make them for themselves. Such a possibility imposes a check of no mean efficiency upon the actual power of the defendant greatly to raise the price of cans.

The number of consumers who formerly made their own cans was both absolutely and relatively greater than it is to-day. Small canners, except under peculiar conditions, such as those with which the Alaskan salmon canneries have to deal, no longer make them. On the other hand, so far as one may make a guess from imperfect data, it is probable the proportion of all kinds of cans made by those who used them is nearly or quite as large as it was 15 or 20 years ago. What has happened has apparently been that there has been a great increase in the consumption of cans, not only for packing fruits and vegetables, but for many other purposes, and that especially for those other purposes the consumption of particular factories or companies has become very large, and that a number of these find it to their interest to make their own cans.

The government contends that the defendant's real predominance in the trade is much greater than the figures and percentages show. It says a good many of the cans which swell the total of independent producers are made in small shops or factories which survive solely because they are individually insignificant, and cater to an almost purely local trade which deals with them because they are at hand. Such concerns are not competitors of defendant in any very important sense. Some, or many, of such shops, would always contrive to live, no matter how complete defendant's domination might be in every sense which counts. All this may be and doubtless is true, but that they do still exist, and might live under conditions still more unfavorable, is a fact which must be taken into account in determining how unlimited defendant's domination of the industry is or can become. That there are such small factories, and they serve a real need, is one of the reasons assigned by a number of witnesses why in their opinion a true monopoly in can making is impossible. It does not even to-day take very much money to go into can making, and if one has industry, character, some little ability, and a fair average of luck, to stay in it. The instant defendant attempts to exert oppressively its great influence in the trade and what may be conceded to be its present domination over prices, these small shops would extend their output and many others would be opened.

### Earnings of Defendant.

It is not well, in dealing with such great and many-sided problems, to ignore any of their conditions, even those the immediate legal bearing of which may be obscure, or even apparently nonexistent. The defendant's financial condition for some years after its formation was none too good. The mistakes of the promoters had been too serious. Before the petition in this case was filed, it had greatly improved. By the time at which this opinion is written, it has fared so well that the day seems near at hand at which all arrears of the

cumulative dividend of 7 per cent. per annum on its more than $40,000,000 of preferred stock will be paid. It would be unwise, in the present state of speculative optimism, to attach undue importance to the prices which are quoted for securities of companies which have, or are said to have, war orders. Yet it is a fact that the common stock of the defendant, which when issued avowedly represented nothing more substantial than hopes, is now selling at something like $60 a share and the preferred at $110. The plants which were taken over at and about the time of defendant's formation could have been duplicated for probably not exceeding $10,000,000. $7,000,000 of cash went into its treasury. At present prices, the securities which represent the original $17,000,000 will sell for $68,000,000, or four times as much. This $51,000,000, or so much of it as will remain when prices are more nearly normal than they are now, has been earned in supplying an article, the ultimate consumers of which comprise almost every individual in the entire population. The poorest and most struggling of the people are relatively, to their total expenditures, large consumers of canned goods. It is true that in the countless steps and many processes which come between the original producer of the fruits or the vegetables or other things which are canned, and the ultimate consumer, there are costs, charges, and profits which in the aggregate far exceed the fraction of a cent a can which the last analysis represents, even as things are and have been, the defendant's gross profit on the sale of each container. If defendant had never been formed, no one can be sure that cans would now be lower.

## Conclusions.

One who sells only one-half of the cans that are sold does not, of course, possess a monopoly in the same sense as he would if he sold all or nearly all of them. Yet he may have more power over the industry than it is well for any one concern to possess. No one can say with any certainty that anybody would be better off if defendant had never, in any way, restrained or controlled absolutely free competition in cans. All that can be argued is that, in view of the declared policy of Congress, the legal presumption must be that which was done was against the public weal.

If it be true that size and power, apart from the way in which they were acquired, or the purpose with which they are used, do not offend against the law, it is equally true that one of the designs of the framers of the Anti-Trust Act was to prevent the concentration in a few hands of control over great industries. They preferred a social and industrial state in which there should be many independent producers. Size and power are themselves facts some of whose consequences do not depend upon the way in which they were created or in which they are used. It is easy to conceive that they might be acquired honestly and used as fairly as men who are in business for the legitimate purpose of making money for themselves and their associates could be expected to use them, human nature being what it is, and for all that constitute a public danger, or at all events give rise to difficult social, industrial and political problems.

The law wishes that industrial and trading corporations shall operate under the checks and balances. imposed by free and unrestrained competition. Doubtless, no one is blind to the evil which such competition itself brings with it, precisely as no thoughtful man can close his eyes to the difficulties which some of our constitutional checks and balances put in the way of securing an ideally efficient government. Congress wished to preserve competition because, among other reasons, it did not know what to substitute for the restraints competition imposes. It has not accepted the suggestions of some influential men that the control of a certain percentage of industry should be penalized. It has not yet been willing to go far in the way of regulating and controlling corporations merely because they are large and powerful, perhaps because many people have always felt that government control is in itself an evil, and to be avoided whenever it is not absolutely required for the prevention of greater wrong.

The problem presented by size and power is one of such far-reaching difficulty that Congress has said, while it does not see how to deal with them when acquired in the legitimate expansion of a lawful business, it will prevent their illegitimate and unnatural acquirement by any attempt to restrain trade or monopolize industry. Perhaps the framers of the Anti-Trust Act believed that, if such illegitimate attempts were effectively prevented, the occasions on which it would become necessary to deal with size and power otherwise brought about would be so few and so long postponed that it might never be necessary to deal with them at all. In administering the anti-trust acts, a number of great and powerful offenders against them have been dissolved. So far as is possible to judge,' the consuming public has not as yet greatly profited by their dissolution. It is perhaps not likely that any benefit could have been expected until in the slow course of time the ownership of the newly created corporations gradually drifts into different hands. In most of the cases in which dissolution has been decreed, the defendants had, not long before proceedings against them were instituted, done things which evidenced their continued intent to dominate and restrain trade by the use of methods which interfered more or less seriously with the reasonable freedom of their customers or their competitors.

As has been shown, defendant for a number of years past has done nothing of the sort. While it had its origin in unlawful acts and thereby acquired a power which may be harmful, and the acquisition of which in any event was contrary to the policy of Congress as embodied in the statute, it has for some time past used that power, on the whole, rather for weal than for woe. In this case, if a dissolution be decreed, it will have as its sole reason the carrying out of the policy of Congress that a trading or industrial corporation shall not, by an attempt to restrain or monopolize trade, become so powerful that it exerts an influence on the industry far greater than that of any of its competitors. A court of equity, in deciding that it will so decree, will not consider whether public good might not be furthered by punishing those who do or try to do illegal things. To administer punishment is not within its province. To make clear the futility of such attempts, by striking

down all that has been done to that end, is as far as it can go. But here we are face to face with the fact that the court cannot undo much that has been done. During the 16 years which elapsed between the decision of United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, and that of United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, much water ran over the dam. Until the opinion in the latter case was handed down, it doubtless would have been inexpedient for the government to have begun proceedings against all combinations, a part of whose original motive was the restraint of trade and the bringing about of monopoly. Before such suits can be instituted, the government must investigate. Such investigations, when simultaneously directed against many large concerns, disturb business. In postponing even such preliminary inquiries until after the Supreme Court had laid down the law, the government was very likely wise.

Nevertheless, time has gone by. Conditions have changed. In this can industry it is absolutely impossible to put things back where they were on the 1st of March, 1901, and, if it were possible, probably highly undesirable.

The record shows that there are many ways in which a large and strong can maker can serve the trade, and a small one cannot. Perhaps it did not require much testimony to show that he who is strong and rich has more ability to serve than he who is poor and weak, provided always that there is an equal wish to do so.

Defendant once sought to emancipate itself from restraints of competition. Its power is great, but, as has already been pointed out, is limited by a large volume of actual competition and to a still greater extent by the potential competition, from the possibility of which in the present state of the industry it cannot escape. Those in the trade are satisfied with it. They do not want it dissolved. Whether its dissolution would profit any one is doubtful. The first and immediate effect would almost certainly be the reverse, whatever larger good might in the end come from it.

I am frankly reluctant to destroy so finely adjusted an industrial machine as the record shows defendant to be. Yet the government, too, has its rights, and has thus far been properly insistent upon them. The case most nearly in point is United States v. International Harvester Co., 214 Fed. 987. There is in that case a strong dissent from a very able judge. Nevertheless, the decision of the court cannot be lightly pushed aside.

The government recognizes that the situation which existed before defendant was formed cannot be restored. What it principally fears is that the defendant will, to the public prejudice, hereafter dangerously use the strength which it gained by its original lawbreaking. Defendant's reply, that in that event it will be time enough for the government to act, does not fully meet the case. If this petition be dismissed upon its merits and without qualification, defendant might be entitled to claim in any future proceeding that nothing here in issue may be there used against it. Nor would a dismissal without preju-

dice, as was proposed in Judge Sanborn's dissenting opinion in United States v. International Harvester Co., supra, altogether meet the case.

An immense volume of testimony has been taken. Much of it could not be again secured. An attempt to do so would involve a useless waste of time and money. In this case counsel on both sides worked with tireless energy. And yet nearly 2 years elapsed between the filing of the petition and the argument in court. It has now been 4½ months since that hearing. The history of the defendant from its organization to the filing of the petition is now of record. It has been fully digested and briefed by counsel. This court has spent many months in its study and has reached, as has already been stated, many definite conclusions as to facts. Why should all this work be wasted? If the defendant shall hereafter do anything which will justify or require the action of the court, there would seem to be no reason why the government should not promptly get the relief, to which it would then be entitled, at little cost to anybody. That result can be easily obtained if a start may then be made from where we now are, which would be impossible if proceedings have to be begun all over again. A dislike for useless waste and destruction makes one loath to follow the authority which may be understood as requiring the breaking up of defendant's organization, in spite of its proved power for good, albeit with serious possibilities of evil. A like instinct rebels against taking any course which may hereafter involve this or any other tribunal's going again over any part of the ground which in this proceeding has once been covered.

Under the circumstances, would it not be better simply to retain the bill, without at present decreeing a dissolution, but reserving the right to do so whenever, if ever, it shall be made to appear to the court that the size and power of the defendant, brought about as they originally were, are being used to the injury of the public, or whenever such size and power, without being intentionally so used, have given to the defendant a dominance and control over the industry, or some portion of it, so great as to make dissolution or other restraining decree of the court expedient. It is, of course, not suggested that this court should or could undertake the regulation of defendant's business. Courts have no such power and no fitness for its exercise. What is proposed is, in default of a better way, of dealing with a somewhat unusual and very difficult condition. It is to be hoped that, before any occasion to act upon the power reserved shall arise, Congress will substitute some other method than dissolution for dealing with the problems which arise when a single corporation absorbs a large part of the country's productive capacity in any one line.

I shall take the course indicated, unless one or the other of the parties insist on my entering such a final decree as will enable them to seek at once a review by a higher tribunal. If either of them does, I am not prepared now to say that they will not be within their rights, and that it will not be my duty to do what they ask. That question is reserved until the occasion for deciding it shall arise.